Dennis L. MIGA, Petitioner,

v.

Ronald L. JENSEN, Respondent.

No. 00–0932.

Supreme Court of Texas.

Argued Oct. 24, 2001.

Decided Oct. 31, 2002.

Rehearing Denied Feb. 27, 2003.

Scott P. Stolley, P. Jefferson Ballew, Thompson & Knight, Dallas, John Cornyn, Attorney General, Austin, Leasa M. Stewart, Oklahoma City, OK, for Petitioner.

B. Frank Cain, Joseph W. Spence, Steven J. Graham, Shannon, Gracey, Ratliff & Miller, Fort Worth, William H. Knull, III, Susan K. Pavlica, Mayer Brown & Platt, Houston, Douglas W. Alexander, Scott Douglass & McConnico, Austin, Anne Gardner, McLean, Sanders, Price, Head & Ellis, Fort Worth, J. Michael Jaynes, Irving, for Respondent.

Justice ENOCH delivered the opinion of the Court, in which Justice HECHT, Justice OWEN, Justice JEFFERSON and Justice RODRIGUEZ joined.

To reward Dennis Miga for work he had done, Ronald Jensen offered him the option to buy a portion of Jensen's stock in a privately-held corporation. When Miga tried to exercise the option, Jensen refused to honor their agreement, and Miga sued. Before trial, the corporation "went public." The primary issue in this appeal is how to properly measure the damages caused by Jensen's failure to deliver the stock under the option's terms. The trial court and court of appeals concluded that Miga could recover damages measured by the subsequent appreciated value of the stock. Because we conclude that the proper measure of damages was the value of the stock on the date the stock option agreement was breached, minus the exercise price, we reverse the court of appeals' judgment in part, affirm in part, and remand the case to the trial court for rendition of judgment in accordance with our opinion.

## I

Jensen hired Miga in 1990 to help run Matrix Telecom, a privately-owned long-distance telephone company. As compensation, Jensen offered Miga, in addition to his salary, a 6% ownership interest in the company. Two years later, Matrix Telecom became a wholly-owned subsidiary of Matrix Communications, and Jensen converted Miga's former 6% interest into a 4.8% ownership share of the new parent company. About that time, Miga set up a meeting between Jensen and the principals of Pacific Gateway Exchange ("PGE"), a fledgling company handling international calls for other telecommunications businesses. Jensen purchased an 80% interest in PGE for $850,000, receiving 11,020 shares of common stock in the privately-held company. Miga soon helped the start-up company secure several major clients. To reward and encourage Miga's productive efforts on PGE's behalf, in July 1993, Jensen orally offered Miga an option to buy 4.8% of Jensen's interest in PGE at Jensen's original cost—that is, 528.96 shares for $40,800, or a little over $77 per share.

On December 4, 1994, Miga sent Jensen a fax indicating that he intended to resign and desired to "settle [his] account." The following day Jensen presented Miga with a termination agreement and severance package that included $300,000 to be paid over thirty months and $450,000 net for Miga's stock in Matrix Communications. The agreement purported to be a "complete accounting" between the parties, but it did not explicitly release Miga's PGE option. When Miga attempted to exercise the option that day, Jensen refused. Miga tried to exercise the PGE option three more times over the next nine months. With his last demand in August 1995, he enclosed a check for $40,800. Jensen rejected these demands and returned Miga's check.

In October 1995, Miga sued Jensen for breach of contract and fraud. At trial, Jensen conceded that he had promised Miga the option, but claimed that the option had been for a scaled price, had terminated on December 31, 1994, was subject to a buy-back if Miga resigned, and most importantly, was released by the termination agreement. Meanwhile, in mid-1996, about eighteen months after Miga's resignation, PGE's stock split 940 to 1, and PGE made an initial public offering. The stock opened at $12 per share, peaked at $45.75 per share, and was worth $35.75 per share at the time of trial in 1997.

The jury found for Miga on all issues, awarding damages of $1,034,400, the difference between the option's exercise price

and the value of the underlying stock as of December 1994, and damages of $17,775,686 for what the trial court called "lost profits." Thus, the jury determined that the value of the 528.96 shares of stock Miga wanted to buy for $40,800 in December 1994 was $1,075,200 ($1,034,400 + $40,800), or about $2,033 per share. Had Miga obtained that stock and held it to the time of trial, November 1997, he would have had 497,222 shares after the split (528.96 × 940). The stock was then publicly trading for $35.75 per share, down from the stock's all-time high the previous month of $45.75. The "lost profits" found by the jury were almost exactly the value of the stock at the time of trial ($17,775,686.50). The jury awarded the same amounts on Miga's fraud claims, as well as $43 million in exemplary damages. The trial court disregarded the fraud and exemplary damages findings, but rendered judgment for $18,810,086, combining the two jury findings on the option contract damages. The trial court also awarded $4,486,385.86 in pre-judgment interest, calculated on the total damage award from December 1994 to January 1998, the date of judgment. To suspend execution of the judgment pending appeal, Jensen filed a supersedeas bond in the amount of $25,496,623.39, which subsequent riders increased to $29,500,000.

The court of appeals affirmed the trial court's judgment notwithstanding the verdict on Miga's fraud and exemplary damages claims.[1] But it struck the $1,034,400 damages award as a double recovery and the pre-judgment interest award as inequitable.[2] The appellate court then affirmed the lost profits award of $17,775,686.[3]

Shortly after the court of appeals' decision, the parties entered into an Agreed Order under which Jensen made "an unconditional tender [to Miga] . . . of the sum of $23,439,532.78 . . . toward satisfaction of the Judgment in order to terminate the accrual of post-judgment interest on that sum." To achieve this objective, the Order provided for a reduction of Jensen's supersedeas bond in this amount. Jensen alleges that, if we affirm the court of appeals' judgment, this arrangement will have saved him approximately $1 million per year in the difference between the post-judgment interest rate of 10% and the lower return on his invested supersedeas bond during the pendency of his appeal to this Court.

## II

Both Miga and Jensen filed petitions for review. Miga, in his petition for review, argues that Jensen's disagreement over the option's terms was tantamount to a denial of the option agreement that the jury found he made, and that this denial together with his behavior during their December 5, 1994 meeting constitute circumstantial evidence that Jensen did not intend to honor the stock option contract at the time it was made in 1993. According to Miga, this evidence, coupled with Jensen's breach, is sufficient to support the jury's fraud finding.[4] Jensen, on the other hand, argues that a dispute over the terms of· an oral agreement cannot, by itself, be any evidence of fraud, thereby transforming a contractual disagreement into the tort of fraud and subjecting a promisor to punitive damages. The court of appeals held that there was no evidence

---

1. 25 S.W.3d 370, 376.

2. *Id.* at 380–81.

3. *Id.* at 377–78.

4. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998).

of fraudulent intent.[5] We agree with the court of appeals. Jensen's conduct after Miga's resignation in 1994 and his dispute at trial over the contract's terms are not evidence that Jensen did not intend to perform when he offered Miga the PGE option in 1993.[6] This is a classic breach of contract case; Miga has no cause of action for fraud.[7]

## III

Before addressing the merits of Jensen's petition, we discuss two preliminary matters interposed by Miga. Miga asserts that Jensen's petition is moot, and if not moot, that Jensen's complaint is not preserved for our review.

## A

■ We first decide whether Jensen's $23.4 million payment to Miga mooted his appeal of the judgment against him. In *Highland Church of Christ v. Powell*, we acknowledged the rule that a judgment debtor's voluntary payment and satisfaction of an adverse judgment moots the controversy, waives the debtor's right to appeal, and requires dismissal of the case.[8] But we emphasized there that the rule's basis is "to prevent a party who has freely decided to pay a judgment from changing his mind and seeking the court's aid in recovering the payment. A party should not be allowed to mislead his opponent into believing that the controversy is over and then contest the payment and seek recovery."[9] We reiterated this rationale in *Riner v. Briargrove Park Property Owners, Inc.*[10]

■ The Texas rule is not, and never has been, simply that any payment toward satisfying a judgment, including a voluntary one, moots the controversy and waives the right to appeal that judgment.[11] In *Highland Church*, we held that the judgment debtor's payment did not moot its appeal because the payment was made under economic duress implied by the threat of statutory penalties and accruing interest.[12] Like *Highland Church*, Jensen was "justifiably anxious to avoid the ... interest which would accrue while the case was on appeal."[13] One must be able to halt the accrual of post-judgment interest, yet still preserve appellate rights. Whether a party wishes to avoid the accrual of post-judgment interest, particularly on a multi-million dollar judgment, is a question that party should be able to decide without fear of a Hobson's choice—that is, that the party might presumptively waive its appellate prospects. But we recognize the further difficulty presented when a party pays a judgment, but the party's intention to appeal that judgment is unclear. Therefore, explicitly reserving the right to appeal when the judgment is paid would be the safe practice in these circumstances; making that reservation on the record would be optimal. Such a reserva-

5. 25 S.W.3d at 376.

6. *See, e.g., Formosa Plastics*, 960 S.W.2d at 48; *Hearthshire Braeswood Plaza Ltd. P'ship v. Bill Kelly Co.*, 849 S.W.2d 380, 389–90 (Tex.App.-Houston [14th Dist.] 1993, writ denied).

7. See, *e.g., Formosa Plastics*, 960 S.W.2d at 48.

8. 640 S.W.2d 235, 236 (Tex.1982).

9. *Id.*

10. 858 S.W.2d 370 (Tex.1993) (per curiam).

11. *See, e.g., Highland Church*, 640 S.W.2d at 236; *Riner*, 858 S.W.2d at 370; *Cont'l Cas. Co. v. Huizar*, 740 S.W.2d 429, 433 (Tex.1987) (Gonzalez, J., dissenting).

12. *See Highland Church*, 640 S.W.2d. at 237.

13. *Id.*

tion does not make the payment conditional. We emphasized in *Highland Church* that a party should not be allowed to simply change his mind about pursuing the case or mislead his opponent into thinking the controversy is over.[14] Thus, payment on a judgment will not moot an appeal of that judgment if the judgment debtor clearly expresses an intent that he intends to exercise his right of appeal and appellate relief is not futile. We take this to be the same rule applicable in the federal courts.[15]

▆ The Agreed Order states that the purpose of Jensen's payment was to "terminate the accrual of post-judgment interest" on the $23.4 million judgment. This purpose makes sense only if post-judgment interest would otherwise be accruing, and interest would continue to accrue only if Jensen was pursuing an appeal of the judgment. Further, in negotiating the Order, Jensen actually discussed its anticipated jurisdictional effect with Miga. According to sworn affidavit testimony, which we may use to ascertain factual matters necessary to the proper exercise of our jurisdiction,[16] Jensen informed Miga that he believed the Agreed Order would not moot his complaint, and that he would continue to pursue appellate review. Miga does not challenge this testimony but complains that his refusal to accede to an express reservation of appeal in the agreed judgment and Jensen's removal of that language makes the payment of the judgment misleading. This is simply not true. While Miga may have believed that Jen-

sen's payment mooted the appeal, he could not have had any reasonable doubt that Jensen believed it did not, or that Jensen intended to pursue the appeal if legally allowed to do so. Consequently, because Jensen's payment was coupled with an expressed intent to pursue his appeal, he did not waive his right to continue to contest the judgment. His appeal is therefore not moot.

▆ Contrary to Miga's argument, our holding does not undermine the Finance Code's post-judgment interest scheme.[17] Post-judgment interest is not a punishment inflicted on a judgment debtor for exercising the right to appeal. Instead, like pre-judgment interest, post-judgment interest is simply compensation for a judgment creditor's lost opportunity to invest the money awarded as damages at trial.[18] When a judgment creditor has received an unconditional tender of the money awarded, and may invest it as he chooses, there is no need for the continuing accrual of post-judgment interest.[19] This is true whether or not an appeal of the underlying judgment is ongoing.[20] Allowing Miga to choose, pending Jensen's appeal, between the continuing accrual of interest on $23.4 million and receipt of that $23.4 million outright is entirely consistent with the Finance Code.[21]

**B**

▆ Regarding whether Jensen preserved error, Miga argues that Jensen failed to preserve his objection to the lost

---

**14.** *Id.* at 236.

**15.** *See Ferrell v. Trailmobile, Inc.,* 223 F.2d 697, 698 (5th Cir.1955).

**16.** *See* TEX. GOV'T CODE § 22.001(d).

**17.** *See* TEX. FIN.CODE §§ 304.001–.007.

**18.** *See, e.g., Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 528 (Tex.1998).

**19.** *See, e.g.,* TEX. FIN.CODE § 304.005(a).

**20.** *See id.* § 304.005(b).

**21.** *See id.* § 304.005.

profits damages measure submitted to the jury. The court of appeals held that error was preserved.[22] We agree with the court of appeals. Twice during the charge conference Jensen asserted that Miga's damages were limited to the value of the stock at the time of breach; the trial court interrupted Jensen the second time, saying, "you've got your objection on the record." The trial court's subsequent refusal to limit the damages submission as requested effectively overruled the objection.[23] Jensen thus "made the trial court aware of the complaint, timely and plainly, and obtained a ruling." [24] Error was preserved.

## IV

We now turn to the proper measure of damages for breach of a stock option contract. The trial court submitted two damages measures to the jury in question 11:

(a) The difference between the cost to exercise the stock option contract per the parties [sic] agreement, if any, and the value of the stock in December, 1994, if any.

**Answer:** $1,034,400.00

(b) Lost profits to Dennis Miga that were a natural, probable, and foreseeable consequence of Ronald Jensen's failure to comply with the agreement, if any.

**Answer:** $17,775,686.00

Neither party requested the lost profits instruction in part (b). In fact, Miga originally objected to the charge on the ground that the damages he sought were direct, not consequential. Jensen argues that the trial court erred in submitting the lost profits question to the jury in this case. We agree with Jensen.

■■■ Miga sought to recover the time-of-trial market gain in the stock he attempted to buy years earlier. His only evidence of "lost profits" was the increased market value of PGE stock, and the jury's award coincided with the stock's market value at the time of trial. But an increase in the market value of goods never delivered under a contract is not the same as lost profits.[25] Lost profits are damages for the loss of net income to a business measured by reasonable certainty.[26] Here, there was no evidence before the jury that Miga suffered reasonably certain business losses resulting from Jensen's breach. Assuming lost profits would be an appropriate measure of damages, resulting from a failed stock sale, Miga did not testify about what particular profit he expected, or that the parties contemplated a particular resale of the stock;[27] in fact, Miga testified that he would not have sold it. There was thus no reasonably certain profit, the loss of which he had sued for. Instead, the loss he alleged—and recovered under the lost profits submission— was the value of a hypothetical option for 4.8% of Jensen's original interest in PGE exercised at the time of trial. Although labeled lost profits, in part (b) the jury awarded Miga the 1997 market gain in the

---

**22.** 25 S.W.3d at 377.

**23.** *See Acord v. Gen. Motors Corp.,* 669 S.W.2d 111, 114 (Tex.1984).

**24.** *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992) (opinion on reh'g).

**25.** *See Whiteside v. Trentman,* 141 Tex. 46, 170 S.W.2d 195, 197 (1943); *see also* 1 DAN B.

DOBBS, LAW OF REMEDIES §§ 3.3(5), 4.5(3) (1993); 3 LAW OF REMEDIES § 12.4(3).

**26.** *See, e.g., Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938).

**27.** *See, e.g., Whiteside,* 170 S.W.2d at 196–97.

stock Jensen refused to sell him in 1994.[28] But the rule in Texas has long been that contract damages are measured at the time of breach, and not by the bargained-for goods' market gain as of the time of trial.[29]

The court of appeals nevertheless upheld the "lost profits" award, reasoning that this Court's decisions in *Randon v. Barton*[30] and *Calvit v. McFadden*[31] support measuring Miga's damages as the option's highest market value between the date of breach and trial because Miga could not easily obtain PGE stock elsewhere at the time of breach.[32] In *Randon*, Randon agreed to sell to Barton, Randon's interest in land certificates which were to be sold to him under a contract with yet another party. As it turned out, Randon did not own all of the interest that he purported to sell. And Barton sued him. Before discussing the measure of damages, this Court noted that the contract over which Barton sued involved "merely . . . the transfer of unlocated land certificates."[33] Thus, the interest being sued over was in the nature of stock rather than the actual property. With that in mind, the Court reinforced the general rule that damages for breach of contract are measured by the value of the good bargained for at the time of breach.[34] But the Court then expressed its concern that that particular measure of damages, when applied to securities, failed to compensate the damaged party to the full measure of his damages. As a result, we applied a limited exception to the general rule, allowing damages for the highest value of the article between the time of breach and the time of trial, because the purchasers had paid the contract price in advance.[35] In *Calvit*, we applied the *Randon* measure of damages to the sale of personal property (cattle) when the purchase price was paid in advance.[36]

Initially, we note that the *Randon* damages measure was patterned on an English and early New York rule,[37] which was subsequently modified by the New York courts for cases involving stock conversion. In an 1889 case involving a broker's mishandling of his client's stock, the United States Supreme Court explained that the rule allowing damages to be measured by the stock's highest value up to the time of trial had proved unworkable.[38] The Court therefore adopted New York's modification in cases where the defendant converted stock owned by the plaintiff, allowing damages to be measured within a reasonable time after plaintiff received notice of the breach.[39] A reasonable time was the time, in theory, that it would take the plaintiff to enter the market and reacquire the stock that had been wrongfully converted.[40]

**28.** *See, e.g., id.* at 196; 1 DOBBS, LAW OF REMEDIES §§ 3.3(5), 4.5(3); 3 LAW OF REMEDIES § 12.4(3).

**29.** *See Heilbroner v. Douglass,* 45 Tex. 402, 407 (1876); *Whiteside,* 170 S.W.2d at 196.

**30.** 4 Tex. 289 (1849).

**31.** 13 Tex. 324 (1855).

**32.** 25 S.W.3d at 378.

**33.** *Randon,* 4 Tex. at 293.

**34.** *See id.; Calvit,* 13 Tex. at 325.

**35.** *See Randon,* 4 Tex. at 293–94; *Calvit,* 13 Tex. at 325–26; *Heilbroner,* 45 Tex. at 407.

**36.** *Calvit,* 13 Tex. at 326.

**37.** *See Randon,* 4 Tex. at 293–95.

**38.** *See Galigher v. Jones,* 129 U.S. 193, 200–01, 9 S.Ct. 335, 32 L.Ed. 658 (1889).

**39.** *See id.* at 201–02, 9 S.Ct. 335.

**40.** *See id.* at 201, 9 S.Ct. 335; *Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136, 140 (2d Cir.1983).

■ The *Randon* damages measure, assuming it is viable today, is inapplicable here. For example, Miga did not pay in advance for his stock interest. Thus, we remain with the general measure of damages. But our decision does not turn on when Miga offered payment for the stock. Because Jensen breached the contract on the same day Miga attempted to exercise his option, the correct measure of damages for Jensen's failure to perform on his promise is the traditional one: "the difference between the price contracted to be paid and the value of the article at the time when it should [have been] delivered. . . ." [41]

This holding is consistent with the approach of at least two Texas courts of appeals that have addressed breach damages for contracts involving corporate stock.[42] Measuring these damages at the time of breach also has the support of other jurisdictions.[43] The New York Court of Appeals, after noting that "[t]he proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach," [44] held that "[t]he rule is precisely the same when the breach of contract is nondelivery of shares of stock." [45]

As the Second Circuit has reasoned, "[m]easuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account. The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce." [46] For this reason, New York courts have "explicitly upheld damage awards based on what 'knowledgeable investors anticipated the future conditions and performance would be at the time of the breach' and have rejected awards based on what 'the actual economic conditions and performance' were in light of hindsight." [47] Thus, the "damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach." [48] We note that the Second Circuit here uses "lost future profits" loosely; in the case of stock, these "future profits" are more precisely the stock's expected market gain over time.[49]

■ Calculating the value of an unexercised option can be a complicated enterprise,[50] requiring the application of finance

---

**41.** *Randon*, 4 Tex. at 293.

**42.** *See Hurst v. Forsythe*, 584 S.W.2d 314, 316–17 (Tex.Civ.App.-Texarkana 1979, writ ref'd n.r.e.); *Bowers Steel, Inc. v. DeBrooke*, 557 S.W.2d 369, 373 (Tex.Civ.App.-San Antonio 1977, no writ).

**43.** *See Hermanowski v. Acton Corp.*, 729 F.2d 921, 922 (2d Cir.1984); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21, 26 (1971); *Finnell v. Bromberg*, 79 Nev. 211, 381 P.2d 221, 227 (1963); *Colo. Mgmt. Corp. v. The Am. Founders Life Ins. Co.*, 148 Colo. 519, 367 P.2d 335, 337 (1961).

**44.** *Simon*, 320 N.Y.S.2d 225, 269 N.E.2d at 26.

**45.** *Id.*

**46.** *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir.1990), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991).

**47.** *Id.* (citation omitted).

**48.** *Id.* at 825.

**49.** *See* 1 Dobbs, Law of Remedies §§ 3.3(5); 3 Law of Remedies § 12.4(3).

**50.** *See Scully v. U.S. WATS, Inc.*, 238 F.3d 497, 508 (3d Cir.2001).

models to determine the present value of the right to purchase stock at a fixed price at some future time.[51] But when, as here, breach occurs when the option holder seeks to exercise the option, the option becomes a straightforward contract to sell a certain amount of stock at a certain price at the time chosen by the holder.[52] When Miga attempted to exercise his option in December 1994, the time for delivery was set; at that point, the option simply represented Jensen's promise to sell Miga 4.8% of his interest in PGE at Jensen's original cost. Jensen failed to deliver the stock when he should have, and damages for failure to deliver stock, like failure to deliver other marketable goods, are measured precisely as they were 150 years ago: the difference between the value of the goods bargained for and the contract price at the time set for delivery.[53]

We note that time-of-breach damages may be inadequate when an employer anticipatorily repudiates an option agreement; that is, the option holder's right to exercise the option has vested, and the employer repudiates the agreement before the right to exercise the option has matured for the option holder, as there could be a question as to the time set for delivery in that circumstance.[54] But that case is not before us; Miga had the right to exercise and chose to exercise his option in December of 1994. The correct measure of damages was therefore presented to the jury in question 11, part (a): "The difference between the cost to exercise the stock option contract per the parties [sic] agreement ... and the value of the stock in December, 1994...." The jury found this difference to be $1,034,400. Although PGE stock was not publicly traded in December 1994, the parties do not dispute that it had a determinable market value then, evidenced in part by two contemporaneous offers to purchase the company for $27,000,000 and $28,000,000 cash. Further, neither party suggests that Jensen's refusal to perform in December 1994 was not a breach, and neither party contests the finding that the option's value at that time was $1,034,400.

Our holding does not preclude the award of lost profits in contract disputes involving stock and stock options. Miga simply did not claim lost profits, and the evidence he offered was relevant to the bargained-for goods' market gain at the time of trial, not to lost profits damages. The court of appeals thus erred in affirming the trial court's lost profits award.

Miga argues that denying him the appreciation in the value of the stock effectively rewards Jensen for breaching the agreement. As it happens, that is true. However, it was far from certain in December 1994 that the value of the stock would appreciate as it did. While Jensen ultimately benefitted from this appreciation, he also assumed the risk that the investment would be lost, just as any stockholder does. To award Miga damages based on the appreciated value of the stock would be to make him better off than he would have been had the agreement been honored by giving him an investment free of the risks other shareholders undertook. More importantly, however, trying to determine what part of the stock's appreciation Miga would have realized had

---

**51.** See Lucente v. Int'l Bus. Machs. Corp., 117 F.Supp.2d 336, 354–55 (S.D.N.Y.2000), adhered to on reconsideration, 146 F.Supp.2d 298 (S.D.N.Y.2001).

**52.** See Lucente, 146 F.Supp.2d at 308–09.

**53.** See Randon, 4 Tex. at 293; Calvit, 13 Tex. at 325; Heilbroner, 45 Tex. at 407.

**54.** See, e.g., Lucente, 146 F.Supp.2d at 308–14; Saewitz v. Epstein, 6 F.Supp.2d 151, 157 (N.D.N.Y.1998).

he obtained the stock in December 1994 is too speculative. Our holding does not punish the innocent option holder as Miga argues. When a closely held corporation's stock has no ascertainable market value, one could seek specific performance to enforce a stock purchase agreement and thereby gain the hoped for benefits, but as well incur the risks.[55]

## V

Finally, Miga argues that $1,034,400 alone, recovered today, is insufficient to compensate him for the loss he suffered due to Jensen's contractual breach in 1994. He is right. All assets, whether property or cash, fluctuate in value over time. But the proper way to make Miga whole is not by allowing him to recover the market gain he would have reaped had he received his stock as promised, managed to pay any taxes potentially owed on his gain without selling a portion of the stock, accepted the risk that the stock would drop below the exercise price, and sold it at the perfect moment when the stock hit its peak two years later. The proper way to compensate Miga for his lost investment opportunity is through the award of interest on his time-of-breach damages.[56]

The trial court awarded 10% pre-judgment interest beginning on the date Miga's suit was filed and running until the date the judgment was signed by the trial court. The court of appeals struck the pre-judgment portion of this award as inequitable in light of Miga's lost profits recovery. Given our holding that Miga's damages must be measured at the time of breach, the trial court was correct to award pre-judgment interest, although it must be computed as simple interest.[57] Miga will also receive 10% post-judgment interest, compounded annually as required by statute.[58]

## VI

Because there is no evidence of fraud, we affirm the court of appeals' judgment as to Miga's fraud and exemplary damages claims. Because we conclude that Jensen's payment to Miga, made in order to stop the accrual of post-judgment interest, did not moot his appeal and that Jensen preserved his objection to the measure of damages submitted to the jury, we reach the merits of Jensen's petition and reverse the court of appeals' judgment. Miga's contract damages should have been measured by the value of the option at the time of breach. Because the correct measure was submitted to the jury in question 11(a) and answered in the amount of $1,034,400, we render judgment for Miga for $1,034,400.

Further, we modify the court of appeals' judgment to reflect that Miga receive 10% pre-judgment interest, computed as simple interest, on his damages running from the date he filed suit to the date of judgment.[59] The judgment will also reflect 10% post-judgment interest,[60] compounded annually,[61] running until August 29, 2000, when the Agreed Order terminated its accrual. The case is remanded to the trial court for

**55.** *See Bendalin v. Delgado,* 406 S.W.2d 897 (Tex.1966) (plaintiff could seek specific performance to enforce a stock purchase agreement when the corporation was closely held and the stock had no market value).

**56.** *See Johnson & Higgins,* 962 S.W.2d at 528; *Heilbroner,* 45 Tex. at 408.

**57.** *See* Tex. Fin.Code § 304.104.

**58.** *See id.* §§ 304.003(c), 304.006.

**59.** *See id.* § 304.104.

**60.** *See id.* § 304.003(c).

**61.** *See id.* § 304.006.

calculation of interest and rendition of judgment accordingly.

Justice O'NEILL filed a dissenting opinion, in which Chief Justice PHILLIPS joined.

Justice SCHNEIDER filed a dissenting opinion.

Justice HANKINSON did not participate in the decision.

Justice O'NEILL, dissenting, joined by Chief Justice PHILLIPS.

Although simple and easy to apply, the Court's time-of-breach damage measure is founded on an economic fiction that woefully deprives Miga of the benefit of his bargain. But worse, it encourages promisors to breach stock-option agreements in a rising market, allowing them to cap their liability while reaping the very profit potential that was promised in exchange for the promisee's performance. Numerous courts across the country, both state and federal, have recognized that applying the rule to stocks is "very inadequate and unjust." *Galigher v. Jones,* 129 U.S. 193, 200, 9 S.Ct. 335, 32 L.Ed. 658 (1889). On the other hand, awarding damages at the highest price the stock attained up to the time of trial has the potential to put the promisee in a better position than if the breach had not occurred because it unrealistically presumes, in hindsight, that the promisee would have sold the stock at precisely the right moment. This approach, too, has been widely rejected. I would apply a damage measure that minimizes the potential to over- or under-compensate the injured party and more closely approximates the value of the benefit lost, that is, the stock's highest intermediate value between the date of breach and a reasonable period in which the injured party could have entered the market and replaced the stock. Because the damage

question submitted in this case did not confine the jury to this measure, it was defective. Consequently, I would reverse and remand the case for a new trial. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex.1997). Because the Court holds otherwise, I respectfully dissent.

I

Over the past decade, stock options have become an increasingly common form of executive compensation. They are often conferred in lieu of more traditional compensation, like salary or cash bonuses, to reward outstanding performance and provide an incentive for hard work to increase the company's, and therefore the option's, worth. Just as stock options have become more and more common, so has litigation involving their value, and "[i]t would be a herculean task to review all the various and conflicting opinions that have been delivered on this subject." *Galigher,* 129 U.S. at 202, 9 S.Ct. 335. Although courts have taken a variety of approaches when measuring damages in this context, most have centered on three general damage models: (1) the stock's value when the wrongful conduct occurred, which is the measure the Court applies, (2) the stock's highest market value between the time of the wrongful conduct and trial, which is the measure the court of appeals approved, and (3) the stock's highest intermediate price between the wrongful conduct and a reasonable time for replacement, which is the approach I favor.

The problem with the Court's damage measure was articulated over 100 years ago by the United States Supreme Court in *Galigher v. Jones, supra.* There, the Court recited the general rule that, as to goods that have a fixed market value at which they can be easily replaced, the measure of damages is their value at the

time of conversion, or, for breach of contract, at the time fixed for their delivery. *Id.* at 200, 9 S.Ct. 335. But the Court emphasized that "the application of this rule to stocks would ... be very inadequate and unjust," because the real injury sustained "consists not merely in the assumption of control over the stock, but in the sale of it at an unfavorable time, and for an unfavorable price." *Id.* Limiting damages to the stock's value when the wrong occurred subjects the wrongdoer "only to nominal damages" and, "in most cases, afford[s] a very inadequate remedy" or "no remedy at all." *Id.* This case provides a perfect example. If Jensen had sold the stock that rightfully belonged to Miga at the optimal time, the Court's time-of-breach damage measure would require Jensen to pay Miga a little over $1 million while allowing Jensen to reap for himself a windfall in excess of $16 million. Surely Jensen's wrongful conduct should not be so handsomely rewarded.

As long ago as 1849, we recognized that time-of-breach damages are often inadequate to compensate a person injured by another's failure to sell or deliver goods whose value fluctuates. In *Randon v. Barton,* 4 Tex. 289 (1849), analogizing to a contract for the delivery of stock, we held that a plaintiff injured by the defendant's breach of an agreement to deliver certain land certificates was entitled to the highest value of the certificates up until the time of trial. 4 Tex. at 295–96. Such a rule, we observed, "would be most consonant with justice." *Id.* at 296. We later declined to apply the *Randon* measure when

> money or *other consideration* for the article contracted for, has not been paid in advance ... or when extraordinary circumstances have occurred to produce extreme prices in the article during a long period of time, and the suit has been protracted without any fault of the defendant, or when the article contract-

ed for is of a perishable nature, or such as is to be readily parted with if delivered, or *when there are other circumstances attending the transaction, not in the ordinary course of trade, calculated to render such a measure of damages inequitable and unjust.*

*Heilbroner v. Douglass,* 45 Tex. 402, 407 (1876) (emphasis added). But we emphasized that "[t]he true measure of damages in all cases is that which will completely indemnify the plaintiff for breach of the contract." *Id.* at 408.

Ignoring the fundamental policy underlying *Heilbroner,* the Court concludes that the *Randon* measure does not apply because Miga had not paid for the options before Jensen refused to perform. 96 S.W.3d at 215. But whether stock is converted or withheld contrary to the parties' agreement should not yield different results when the injury suffered is the same—the plaintiff's lost ability to control when to optimize profits. *See, e.g., Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136, 141 (2d Cir.1983) (holding that *Galigher* rule applies whether stock is "converted, not delivered according to contractual or other legal obligation, or otherwise improperly manipulated," and noting "many cases" that have applied the conversion measure to breach of contract) (citations omitted); *Lucente v. IBM Corp.,* 117 F.Supp.2d 336, 356 (S.D.N.Y.2000) ("Courts have sought out an intermediate ground in cases where the defendant's breach or tortious conduct deprived plaintiff of the opportunity to sell securities at an optimal price.").

The superficiality of the Court's distinction is particularly apparent here, where Miga tried to pay the options' exercise price but Jensen refused to accept it. Moreover, the Court's analysis ignores the fact that Miga was granted the options, in

part, to reward his past performance. By refusing to deliver the stock as promised, Jensen, in effect, converted compensation that Miga was due for services he had provided. There is no dispute that Miga exercised his option and would have paid the exercise price had Jensen not prevented him from doing so by refusing to honor his contractual obligation.

The Court also reasons that Miga was not entitled to recover the stock's increased market value as "lost profits" because there was no evidence that Miga suffered "business losses," 96 S.W.3d at 213, and because "Miga did not testify about what particular profit he expected, or that the parties contemplated a particular resale of the stock." 96 S.W.3d at 213. But whether or not the stocks' increased market value is properly characterized as "lost profits" in the traditional sense, there is ample evidence to show that the actual benefit bargained for was the potential to reap profits that an increase in the stocks' market value would yield. Both Jensen and Miga were reasonably certain that PGE would become profitable and eventually go public. See 25 S.W.3d at 379. Jensen's own testimony that he gave PGE stock options to his children to avoid estate taxes is some evidence that he anticipated an increase in the stocks' value. Miga was not required to demonstrate "business losses" in order to recover lost profit potential that was a natural, probable, and foreseeable consequence of Jensen's breach. Moreover, numerous courts have refused, as the court of appeals did in this case, to require a person who has been prevented from obtaining goods by the wrongful act of another to establish a particular sale in order to recover. See, e.g., id.; Duncan v. Theratx, Inc., 775 A.2d 1019, 1022 (Del.2001); American Gen. Corp. v. Continental Airlines Corp., 622 A.2d 1, 10 (Del.Ch.1992). Requiring Miga to prove a particular sale "is to require

him to prove that he would have taken the 'very steps' that defendant's 'wrongful act ... precluded him from taking.'" American Gen., 622 A.2d at 10 (quoting Kaufman v. Diversified Indus., Inc., 460 F.2d 1331, 1336 (2d Cir.1972)).

The Court concludes that "[t]he proper way to compensate Miga for his lost investment opportunity is through the award of interest on his time-of-breach damages." 96 S.W.3d at 217. But to say that interest on time-of-breach damages will somehow fairly compensate Miga for the benefit lost by Jensen's breach ignores the nature of the transaction at issue. Pre- and post-judgment interest do not compensate for lost opportunities, but merely serve to make the injured party whole by providing compensation for the lost use of funds that the defendant rightfully owed. See Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552 (Tex.1985).

While the Court's time-of-breach damage measure deprives Miga of the very benefit he bargained for and rewards Jensen's breach, the measure that the court of appeals approved—the highest value the stock attained before trial—has the potential to overcompensate Miga and place him in a better position than if the breach had not occurred. Such a measure allows Miga to avoid any risk of market downturns and, in hindsight, pick the precise moment when the stock reached its highest point. This approach, too, has been widely rejected. See, e.g., Galigher, 129 U.S. at 201, 9 S.Ct. 335 (recognizing "[t]he hardship which arose from estimating the damages by the highest price up to the time of trial, which might be years after the transaction occurred...."); Schultz, 716 F.2d at 140 (considering highest price before trial unfair in granting plaintiff the benefit of hindsight and allowing him to

choose precisely the market's most favorable price).

Rather than allocate all of the market risk to Jensen, or deprive Miga of his anticipated profit potential, I would follow a damage measure that allows Miga to recover market increases that occurred before the expiration of a reasonable time in which he could have mitigated his damages by entering the market and replacing the stock. This measure is patterned on the so-called "New York rule," which the United States Supreme Court approved in *Galigher* as "the true and just measure of damages in these cases," that is, "the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock." 129 U.S. at 201, 9 S.Ct. 335. The Court concluded that this rule "has the most reasons in its favor," and adopted it "as a correct view of the law." *Id.* at 202, 9 S.Ct. 335. The balance this damage measure strikes was ably described by the Eighth Circuit in *McKinley v. Williams,* and bears repeating here:

Compensation is the general standard for the measure of damages. It is the actual and proximate loss caused by the wrong for which the plaintiff is entitled to indemnity. Hence the general rule is that the measure of damages for the failure to deliver property according to the contract, or for its conversion, is the value of the property at the time it was to be delivered, or at the time it was converted. This general rule, however, has been found inadequate to furnish just indemnity for the losses occasioned by the conversion of, or the wrongful failure to deliver, stocks and other properties of like character, the values of which are subject to frequent and wide fluctuations. The general rule gives to the agent, broker, or person in possession of such property, that is really valu-

able, frequent opportunity to convert it to his own use, at a time when its market price is far below its actual value, and thus offers a prize for the breach of duty, while it often leaves the injured party remediless. To prevent this injustice ... an exception has been ingrafted upon this general rule. It is founded upon the proposition that he who deprives another of the possession and control of such property ought to assume the risk of the fluctuations in its market value, until its owner, by purchase or sale, can restore himself to the condition in which he would have been if his property had not been wrongfully taken.... The exception is that the measure of damages for the failure to sell or to deliver stocks and like speculative property, or for the conversion thereof, is the highest market value which the property attains between the time when the contract required its sale or delivery, or the time of its conversion, and the expiration of a reasonable time, to enable the owner to put himself in statu quo, after notice to him of the failure to comply with the contract, or of the conversion. This measure of damages in such cases has not been universally adopted. There are many and conflicting decisions relative to its form and its justice. But, after a careful consideration of all the authorities and the reasons which justify it, the supreme court adopted it in 1888, and that must conclude the discussion in this court.

74 F. 94, 102–103 (8th Cir.1896) (citing *Galigher,* 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658); *see also Clements v. Mueller,* 41 F.2d 41, 42 (9th Cir.1930) (same); *Schultz,* 716 F.2d at 141 (holding damage measure to be higher of the stock's "(1) ... value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable

time thereafter during which the stock could have been replaced had that been desired"); *Stoddard v. Manufacturers Nat'l Bank of Grand Rapids*, 234 Mich. App. 140, 593 N.W.2d 630, 636–37 (1999); *Haft v. Dart Group Corp.*, 877 F.Supp. 896, 902 (D.Del.1995).

In this case, the court of appeals held that Miga's damages were properly measured as of the time of trial, rather than within a reasonable period after the breach, because Miga could not afford to pay the $12 per share opening price when the stock went public. 25 S.W.3d at 378. But an injured party is not required to actually replace the stock in order for the reasonable-time-after-breach measure to apply. *See Schultz*, 716 F.2d at 140. To require the injured party to actually reenter the market and take on additional financial risk in the hope of avoiding future potential losses could result in increased damages and frustrate the rule's intent to make the injured party whole. *Id.* Instead, this damage measure subsumes concepts of mitigation without subjecting plaintiffs or defendants to open-ended risks of market fluctuations. *Stoddard*, 593 N.W.2d at 634, 639; *see also Theratx, Inc.*, 775 A.2d at 1023. What amounts to a reasonable period during which reentry into the market would be "both warranted and possible" will vary, of course, depending upon the facts of the case, but reentry into the market "establish[es] the outer time limit of a reasonable period during which the highest intermediate value of the lost stock could be ascertained." *Schultz*, 716 F.2d at 140 (citing *Letson v. Dean Witter Reynolds, Inc.*, 532 F.Supp. 500, 503 (N.D.Cal.1982)).

In determining what constitutes a reasonable period of time in which to replace the stock, courts have factored in some time allowance for the injured party to obtain advice and to evaluate the market. *See, e.g., Stoddard*, 593 N.W.2d at 636 (reasonable period is "that which is necessary to make and effectuate a considered judgment"); *Burhorn v. Lockwood*, 71 A.D. 301, 75 N.Y.S. 828, 830–31 (1902) ("[T]he customer is entitled to a reasonable opportunity to consult counsel, to employ other brokers, and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day, or when the stock reaches a particular quotation. . . ."). This period, as already said, will vary from case to case and normally will present a question for the jury. *See, e.g., Stoddard*, 593 N.W.2d at 634.

When Jensen failed to deliver the stock as promised, all PGE stock was privately held and unavailable on the open market. If the evidence were to show that Miga could not have obtained the stock from another source until PGE went public some eighteen months later, then the $12 per share opening price would represent the highest value the stock attained between the breach and the time for replacement, and Miga would be entitled to recover the difference between that price and the option's exercise price, or $5,925,864.[1] But the record in this case does not establish as a matter of law that this was the first opportunity Miga had to replace the stock. Accordingly, rendition of judgment in Miga's favor for this amount is inappropriate, and the case should be remanded for a new trial with a proper damage instruction.

Because the Court adopts an improper damage measure in this case, I respectfully dissent.

---

1. Miga's option entitled him to purchase 4.8%, or 497,222 shares, of Jensen's PGE stock at a cost of $40,800, and the undisputed evidence shows that the stock's opening price was $12. Thus, 497,222 × 12 − $40,800 = $5,925,864.

Justice SCHNEIDER filed a dissenting opinion.

The threshold issue in this case is whether the Court has jurisdiction to consider Jensen's appeal even though he voluntarily paid the underlying judgment. Because the Court concludes that Jensen's payment did not moot the appeal, I dissent.

## I. BACKGROUND

After the court of appeals issued its opinion on August 3, 2000, Jensen moved in the trial court to deposit in the trial court's registry the total amount of the actual damages award based on the court of appeals' opinion—nearly $23,500,000. Jensen's motion explained that the coupon rate of the Treasury Bonds he posted as security for the original supersedeas bond was lower than the post-judgment interest accruing on the damages award. Consequently, the motion asserted, Jensen no longer desired to suspend execution of the judgment. Jensen's prayer for relief asked the trial court to "[o]rder that, immediately upon the deposit as provided above, Miga, by and through his attorneys, be immediately allowed to withdraw, without condition, the funds from the registry of the court as payment of the current amount of The Judgment."

After several negotiations between the parties, Miga and Jensen entered into an Agreed Order. The Agreed Order provides, in pertinent part, that "Jensen desires to make an unconditional tender" to Miga of over $23,000,000 "toward satisfaction of the Judgment in order to terminate the accrual of post-judgment interest on that sum."

On August 29, 2000, the trial court signed the Agreed Order. On that same day, Jensen issued a check to Miga and his attorneys for $23,439,532.78. Then, on October 20, 2000, Jensen petitioned this Court to challenge the actual damages award of over $23,000,000. Three days later, Miga likewise petitioned this Court to challenge the court of appeals' decision to reduce the actual damages, calculate pre-judgment interest differently than the trial court, and affirm the trial court's JNOV on the punitive damages and fraud claims. Miga also moved for the Court to dismiss Jensen's petition for lack of jurisdiction.

## II. PARTIES' JURISDICTIONAL ARGUMENTS

Miga contends that, under Texas law, Jensen's voluntarily paying the actual damages award moots Jensen's appeal. In response, Jensen contends that his paying the actual damages award does not moot his appeal because the accrual of post-judgment interest rendered him "justifiably anxious." Jensen concedes that he could have allowed the Treasury Bonds securing the supersedeas bond to lapse so he could invest the collateral more effectively and give Miga the opportunity to execute on the judgment. But, Jensen asserts, forcing Miga to execute on the judgment and make the $23,439,532.78 payment "obviously involuntary" would have needlessly burdened Miga, the court, and the sheriff.

## III. APPLICABLE LAW

Generally, when an event occurs after a judgment that renders an issue before an appellate court moot, the court cannot decide the appeal. *Gen. Land Office of Tex. v. OXY U.S.A., Inc.,* 789 S.W.2d 569, 570–71 (Tex.1990); *see also Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988) (appellate courts cannot decide moot controversies). This is why Texas courts have repeatedly recognized that, if "a judgment debtor voluntarily pays and satisfies a judgment rendered

against him, the cause becomes moot." *Highland Church of Christ v. Powell,* 640 S.W.2d 235, 236 (Tex.1982); *see also Riner v. Briargrove Park Prop. Owners, Inc.,* 858 S.W.2d 370, 370–71 (Tex.1993); *Cont'l Cas. Co. v. Huizar,* 740 S.W.2d 429, 430 (Tex.1987); *Employees Fin. Co. v. Lathram,* 369 S.W.2d 927, 930 (Tex.1963); *Hanna v. Godwin,* 876 S.W.2d 454, 457 (Tex.App.-El Paso 1994, no writ); *Dalho Corp. v. Tribble & Stephens,* 762 S.W.2d 733, 734 (Tex.App.-San Antonio 1988, no writ); *Stylemark Constr. v. Spies,* 612 S.W.2d 654, 656 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ); *Otto v. Rau Petroleum Prods.,* 582 S.W.2d 504, 504 (Tex.Civ.App.-Houston [1st Dist.] 1979, no writ); *Travis County v. Matthews,* 221 S.W.2d 347, 348–49 (Tex.Civ.App.-Austin 1949, no writ).

This Court first recognized the voluntary-payment-of-judgments rule in 1887. *See Cravens v. Wilson,* 48 Tex. 321, 323 (1877) (recognizing that "[i]t may be, that in some case, where there is a voluntary execution or satisfaction of the judgment by the parties, neither an appeal nor writ of error to the Supreme Court would be entertained by the court."). Since then, Texas courts have identified only limited circumstances under which a judgment debtor's paying the judgment did not moot the appeal. The mere fact that a judgment is paid "under protest" will not prevent the case from becoming moot upon payment. *Cont'l Cas. Co.,* 740 S.W.2d at 430 (quoting *Highland Church,* 640 S.W.2d at 236). Rather, the payment must be *involuntary. Highland Church,* 640 S.W.2d at 236. To demonstrate that a party involuntarily paid a judgment so that such payment does not render the appeal moot, the record must show that the party paid the judgment under duress or to preclude execution. *See, e.g., Riner,* 858 S.W.2d at 370–71; *Highland Church,* 640 S.W.2d at 237.

Federal courts have a different approach for determining if a debtor's paying the judgment moots the appeal. Federal courts hold that "payment of a judgment, of itself, does not cut off the payor's right of appeal." *Ferrell v. Trailmobile, Inc.,* 223 F.2d 697, 698 (5th Cir.1955) (citing *Dakota County v. Glidden,* 113 U.S. 222, 224–25, 5 S.Ct. 428, 28 L.Ed. 981 (1885)). This rule does not apply "when such payment is by way of compromise or shows an intention to abide by the judgment, when the payment is coupled with the acceptance of benefits under the judgment, or when compliance with the judgment renders appellate relief futile." *Ferrell,* 223 F.2d at 698.

## IV.  ANALYSIS

In resolving the mootness issue, the Court correctly states the general rule and policy underlying it established in *Highland Church.* That is, when a judgment debtor voluntarily pays and satisfies a judgment rendered against him, the cause becomes moot, because a party should not be allowed to mislead his opponent into believing that the controversy is over and then contest the payment and seek recovery. 96 S.W.3d at 211 (discussing *Highland Church,* 640 S.W.2d at 236). However, the Court does not thoroughly describe the circumstances in *Highland Church* which dictated the holding that the Church's payment did not moot the appeal.

In *Highland Church,* the Court did not hold that the Church's paying the judgment was involuntary—or in other words, under duress—simply because the Church sought to avoid statutory penalties and interest. *See Highland Church,* 640 S.W.2d at 237. Rather, the Court observed that it had never decided whether duress may be implied when a party pays a judgment because of a statute that

"merely imposes a penalty and interest for failure to timely pay a tax." *Highland Church*, 640 S.W.2d at 237. Then, instead of deciding that issue, the Court recognized that implied duress does arise when a business is faced with paying a tax or risk losing its right to do business while contesting the tax. *Highland Church*, 640 S.W.2d at 237. The Court concluded that the Church's paying the delinquent tax judgment did not moot the pending appeal, because the Church was justifiably anxious about the accruing interest and penalties, and *"[m]ore importantly*, it would have been very embarrassing for this religious institution to have execution issued against it." *Highland Church*, 640 S.W.2d at 237 (emphasis added). Accordingly, the Court relied on the "business compulsion" factor to hold the Church's payment did not moot the appeal; in other words, the Church faced duress in losing its property under writ of execution if it did not pay the judgment. *Highland Church*, 640 S.W.2d at 237; *see also Riner*, 858 S.W.2d at 370–71 (party involuntarily paid judgment because he paid only after opponent sought writ of execution on property).

Ignoring *Highland Church*'s entire rationale for allowing the Church to appeal, the Court concludes that Jensen was "justifiably anxious" to avoid the post-judgment interest accruing on the judgment just as the threat of statutory penalties and interest caused the Church economic duress. 96 S.W.3d at 211. The Court explains that "[o]ne must be able to halt the accrual of post-judgment interest, yet still preserve appellate rights." 96 S.W.3d 211. But, the Court notes, a party should explicitly reserve the right to appeal when paying the judgment and "making that reservation on the record would be optimal." 96 S.W.3d 211. Therefore, the Court concludes, "payment on a judgment will not moot an appeal of that judgment if the judgment debtor clearly expresses an in-

tent that he intends to exercise his right of appeal and appellate relief is not futile. We take this to be the same rule applicable in the federal courts." 96 S.W.3d at 212, n. 16.

But the Court's focusing on whether the judgment debtor clearly expressed an intent to exercise his appellate rights and whether appellate relief is not futile—an inquiry the Court correctly likens to the federal approach—is a significant departure from the Texas rule. As previously discussed, the federal approach assumes that a party's paying the judgment *does not* moot the appeal unless payment is by way of compromise or shows an intention to abide by the judgment, payment is coupled with the acceptance of benefits under the judgment, or compliance with the judgment renders appellate relief futile. *Ferrell*, 223 F.2d at 698. On the other hand, Texas law assumes that a party's paying the judgment is voluntary and *does* moot the appeal unless the evidence demonstrates that the payment was involuntary as our case law defines that term. *See Riner*, 858 S.W.2d at 370–71; *Highland Church*, 640 S.W.2d at 237. Thus, under the Texas rule, if the judgment debtor cannot show that he involuntarily paid the judgment, the appeal is moot. However, under the rule the Court applies today, the presumption that the appeal is moot unless the judgment debtor proves the payment was involuntary no longer applies. Moreover, after today, a Texas judgment debtor need only show an intent to appeal—which is not difficult to do as this case's circumstances demonstrate—to preserve appellate rights.

The Court suggests that its focus on whether the debtor clearly expressed an intent to appeal and whether appellate relief is futile (which follows the federal approach) is consistent with the policy in *Highland Church*. That is, a party should

not be allowed to simply change his mind about pursuing the case or mislead his *opponent into thinking the controversy is over*. *Highland Church*, 640 S.W.2d at 236. But even if the Court correctly states that its approach upholds the policy underlying the Texas rule, the Court's determining that Jensen's appeal is not moot under this case's circumstances produces a result contrary to that policy. The Court relies on a post-trial affidavit from Jensen stating he informed Miga that he believed the Agreed Order did not moot the appeal, which he intended to pursue. However, other record evidence shows Jensen's payment *misled* Miga. The Agreed Order between the parties expressly states that Jensen made an "unconditional tender" of the actual damages award to Miga. Moreover, the negotiations between the parties, evidenced in their attorneys' letters in the record, demonstrate that Miga refused to enter into the Agreed Order unless Jensen excluded any language giving him the right to appeal. Thus, the record demonstrates that Jensen misled Miga into foregoing any further post-judgment interest and believing the controversy was over, only so that Jensen could change his mind and now seek this Court's aid in recovering the payment. This is the exact consequence the policy behind Texas's voluntary-payment-of-judgment rule seeks to avoid. *See Highland Church*, 640 S.W.2d at 236.

Additionally, the Court wholly fails to explain how, under the standard it announces today, appellate relief in this case is not futile. Jensen made an unconditional payment of nearly $24,000,000 to Miga in August 2000. Two years later, this Court holds that the trial court's $24,000,000 damages award should only be $1,000,000 plus interest. The Court does not explain how Jensen will recover the money he voluntarily and unconditionally paid to Miga. Ironically, the Court's decid-

ing this appeal when it should dismiss for want of jurisdiction may very well cause more litigation about this money.

Unfortunately, the Court does not recognize the import of its decision to accept as valid Jensen's argument for why his paying the judgment did not moot his appeal. Jensen has consistently argued that he paid the judgment because the post-judgment interest accruing on the actual damages award was higher than the interest accruing on the Treasury Bonds he posted to secure the supersedeas bond. By accepting Jensen's argument as a legitimate basis for holding the appeal is not moot—regardless of whether the federal or Texas approach applies—the Court allows judgment debtors facing significant damages awards to pay the judgment, avoid post-judgment interest, and still appeal simply because they have a "leg up" over parties with smaller pocket books who cannot afford to play the interest game in the financial market. This, perhaps, shows why this Court has not held that a party's anxiety about accruing post-judgment interest alone renders a judgment debtor's paying the judgment involuntary. *See Highland Church*, 640 S.W.2d at 237.

Finally, the Court contends that its holding does not undermine the Finance Code, because post-judgment interest is not intended to punish a judgment debtor for exercising his right to appeal. While I agree that the Finance Code's post-judgment interest provisions are not punitive, the provisions do create an incentive to pay the judgment and end the litigation. But, as this case demonstrates, allowing a judgment debtor to pay the judgment but still pursue the appeal merely because the post-judgment interest is burdensome prolongs the litigation and likely requires further court intervention for the debtor to recover the money if he prevails on appeal.

I fear the Court's opinion opens the doors for future judgment debtors incurring substantial post-judgment interest to follow Jensen's lead, thereby producing more litigation.

## V. CONCLUSION

It is a fundamental tenet that this Court cannot decide moot controversies. *OXY U.S.A., Inc.,* 789 S.W.2d at 570–71; *Camarena,* 754 S.W.2d at 151. This prohibition is rooted in the Texas Constitution's separation of powers doctrine, which prohibits courts from rendering advisory opinions. *See* TEX. CONST. art. II, § 1. Because Jensen's voluntarily paying the judgment mooted his appeal, I would dismiss his petition for want of jurisdiction.