02-11-074 & 167-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00074-CV

 

 


 
 
 Dennis L. Miga
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Ronald L. Jensen
 
 
  
 
 
 APPELLEE
 
 


 

----------

FROM THE 352nd
District Court OF Tarrant COUNTY

----------

AND

NO. 02-11-00167-CV

 

 


 
 
 IN
 RE DENNIS L. MIGA
 
 
  
 
 
 RELATOR
 
 


 

----------

ORIGINAL
PROCEEDING

----------

MEMORANDUM
OPINION[1]

----------

The
dispute between these parties has spanned more than sixteen years.[2]  The
current appeal and petition for mandamus result from the trial court’s 2011
postjudgment injunction enjoining Appellant/Relator Dennis L. Miga and his wife
from spending, depleting, secreting, or transferring $21,560,150.67, plus
prejudgment interest—except in the ordinary course of business or for
reasonable and necessary household and living expenses or reasonable and
necessary attorney’s fees—until that amount is finally paid to Appellee/Real
Party in Interest Ronald L. Jensen.

In
his petition for writ of mandamus and appeal, which we consolidated, Miga
complains that the trial court had no jurisdiction to enter the postjudgment
injunction and, alternatively, that the trial court abused its discretion by
doing so.  Because we hold that the injunction is not appealable, we dismiss
Miga’s appeal.  Because we hold that the trial court had jurisdiction to issue
the injunction and did not abuse its discretion by doing so, we deny Miga’s
petition for writ of mandamus.

I. 
Facts and Procedural History

A. 
Miga’s Suit

In January
1998, Miga obtained a trial court judgment against his former employer, Jensen,
for about $18.8 million plus approximately $4.5 million in prejudgment interest.[3] 
Jensen appealed.[4]  To end the accrual of
postjudgment interest, the parties entered into an agreed order, signed by the
trial court, under which Jensen tendered $23,439,532.78 to Miga toward
satisfaction of the judgment.[5]  On appeal, the Supreme
Court of Texas reduced Miga’s judgment to $1,034,400; reinstated prejudgment
interest at a rate of 10%; and also awarded postjudgment interest at a rate of
10% from the date of the trial court’s judgment to the date the agreed order
terminated the accrual of postjudgment interest.[6]  On remand, the trial
court rendered a modified judgment for Miga of $1,879,382.11.[7]

B. 
Jensen’s Suit

Jensen
then sought restitution of the difference between the modified judgment and the
amount he had already paid to Miga.[8]  Miga refused to repay
Jensen the $21,560,150.67, so Jensen filed suit against Miga for restitution
(Jensen’s lawsuit).[9]

In
February 2004, while Jensen’s lawsuit was pending, the trial court entered a
temporary injunction (the 2004 temporary injunction) prohibiting Miga and his
wife from spending, dissipating, or otherwise moving $21,560,150.67, except in
the ordinary course of business and reasonable and necessary living expenses. 
The trial court found in the 2004 temporary injunction that injunctive relief
was necessary to preserve the status quo and that Miga had admitted that he no
longer had the whole amount Jensen had paid him.  The 2004 temporary injunction
stated that it was effective “until judgment in this cause is rendered by this
Court.”  On March 3, 2005, the trial court entered an order extending the 2004 temporary
injunction, stating that it “shall survive the entry of final judgment by this
Court and shall remain in effect until a final, non-appealable judgment is
entered in this cause and all rights to appeal in this cause have been
exhausted or expired.”

The
next day, the trial court signed an order granting summary judgment for
Jensen.  The trial court signed a final judgment in the cause on April 19,
2005, ordering that Jensen recover $21,560,150.67 plus prejudgment and
postjudgment interest.[10]  The judgment states
that the March 3, 2005 order extending the 2004 temporary injunction “shall
remain in force following the entry of this judgment in accordance with its
terms.”

On
May 7, 2005, the trial court modified its judgment to dismiss without prejudice
all claims asserted against Miga’s wife pursuant to the parties’ stipulation.  Like
the previous judgment, the modified judgment provides that the March 3, 2005
order extending the 2004 temporary injunction “shall remain in force following
the entry of this [j]udgment in accordance with its terms.”

This
court affirmed the trial court’s judgment, and the Supreme Court of Texas
affirmed this court’s judgment on October 23, 2009.[11]  Miga filed a motion for
rehearing in that court.

C.  Jensen’s
Recent Attempts to Enforce Judgment Against Miga

While
Miga’s motion for rehearing was pending, the parties’ attorneys filed with the
trial court a Rule 11 agreement (dated December 7, 2009) in which they agreed
to extend the 2004 temporary injunction “for two weeks beyond the date on which
that Order would otherwise expire by its terms,” that is, two weeks beyond the
date on which all rights to appeal had been exhausted or expired.

Then,
on January 15, 2010, the Supreme Court of Texas issued mandate.  Ten days later,
Jensen filed with the trial court an application for a temporary restraining
order, injunction, and expedited discovery.  On January 27, 2010, after a
hearing on Jensen’s application, the parties filed with the trial court another
Rule 11 agreement, this time agreeing to extend the 2004 temporary injunction
“until the time the Court enters a replacement temporary restraining order or
temporary injunction.”  In March 2010, Jensen deposed Miga.

On
January 14, 2011, Miga filed a motion to declare the 2004 temporary injunction
dissolved, asserting that (1) although the parties had filed the December 2009 and
January 2010 Rule 11 agreements with the trial court, that court had never
issued an order on the agreements and (2) he was withdrawing his consent to the
entry of any agreed order by the trial court based upon the Rule 11
agreements.  Miga asked the trial court to declare that the temporary
injunction had dissolved by its own terms.  Miga argued in his motion that the
extension had been issued under civil practice and remedies code section 52.006
and rule of appellate procedure 24.2,[12] that the trial court’s
authority expired under those rules when the appeals were exhausted, that
“[t]he attempt by the parties to confer on the Court by agreement additional
authority after the determination of the appeal [was] improper and ineffective,”
and that “[t]he Court’s authority under the statutes and rules during the
pendency of the appeal [was] no longer applicable . . . .” 
He further argued that the trial court had no authority under section 31.002 of
the civil practice and remedies code (the turnover statute) to enter an
injunction prohibiting him from making expenditures.[13]

On
January 26, 2011, Jensen filed a combined emergency motion to enforce the Rule
11 agreement and application for temporary restraining order and injunction.  Jensen
argued that the Rule 11 agreement was valid and enforceable because it was in
writing, signed by the parties, and filed with the trial court.  He asserted
that the trial court had jurisdiction “over this post-judgment collection
action,” including authority under sections 31.002 and 52.006(e) of the civil
practice and remedies code.

The
trial court held a hearing on February 14, 2011.  The trial court concluded
that a valid and enforceable Rule 11 agreement existed and that Miga had violated
the agreement by secreting assets and concealing the existence and location of
the assets.  The trial court further concluded that it had the authority to
enjoin Miga from secreting or further dissipating assets under the turnover
statute.  The trial court entered a turnover order, ordering Miga to turn over
all assets in various accounts and to disclose to Jensen the location and
account numbers of any other bank or account over which Miga or his wife had
signature authority.  Miga did not appeal or otherwise challenge the turnover order.

The
trial court also entered a “temporary” injunction ordering Miga to “cease,
desist and refrain from spending, dissipating, depleting, secreting, or
otherwise moving, transferring, or burdening, other than in the ordinary course
of business and/or for reasonable and necessary household and living expenses
and/or reasonable and necessary legal fees” the amount of $21,560,150.67, plus
prejudgment and postjudgment interest.  It is from this new injunction that
Miga both appeals and seeks mandamus relief.

D.  Findings
of Fact and Conclusions of Law

The new
injunction signed by the trial court contains the following findings and
conclusions of law:

1.       The
mandate issued by the Texas Supreme Court on January 15, 2010 made this Court’s
Judgment final and non-appealable.  The Judgment is now final, fully enforceable,
and due to Jensen in full as follows:

(a)     The
principal amount of $21,560,150.67 together with pre-judgment interest thereon
in the amount of $1,465,204.21, calculated at the rate of 5.50% simple interest
from December 12, 2003, through March 8, 2005, plus $3,248.79 per day from
March 8, 2005 until the day preceding the date of this judgment; plus

(b)     Post-judgment
interest, calculated at the judgment interest rate of 5.50% compounded annually
on the unpaid balance from the date of judgment until Jensen is paid.

2.       Miga
has to date refused to pay the amount due on the Judgment in whole or in part,
and testified that he has no intention of paying the Judgment.

3.       In
May 2004, in conjunction with Jensen’s suit before this Court to recover the $21.5
million Miga owed him at that time, this Court entered a temporary injunction
barring the Migas from “spending, dissipating, depleting, secreting, or
otherwise moving, transferring, or burdening, other than in the ordinary course
of business and/or for reasonable and necessary household and living expense,
funds and assets in the amount of $21.560,150.67 . . . .”

4.       In
March 2005, the Court signed an order extending the temporary injunction,
pursuant to the parties’ agreement in return for Jensen’s agreement to waive
the requirement of a supersedeas bond, while Miga appealed this Court’s grant
of summary judgment (the “Injunction”).  The Injunction provided that it would
automatically dissolve “upon entry of a final, non-appealable judgment in this
cause and the exhaustion or expiration of all rights of appeal.”

5.       On
December 7, 2009, after the Texas Supreme Court’s decision denying Miga’s
appeal, but before the Court’s denial of Miga’s Motion for Rehearing and
issuance of the Mandate, the parties filed a Rule 11 Agreement with the Court
in which they agreed to extend the Injunction an additional two weeks beyond
when it would otherwise expire.

6.       The
Texas Supreme Court denied Miga’s Motion for Rehearing and issued its Mandate
on January 15, 2010, thus making this Court’s 2005 judgment (the “Judgment”)
final and non-appealable, and triggering the final two weeks of the Injunction.

7.       Miga
refused to extend the Injunction pending post-judgment collection proceedings,
and Jensen filed an Application for Temporary Restraining Order and Injunction
and Expedited Discovery with this Court on January 25, 2010.

8.       After
the hearing on Jensen’s motion on Jan. 27, 2010, the parties filed a Rule 11
agreement (the “Agreement”) with the Court extending the term of the Injunction
“until the time the Court enters a replacement temporary restraining order or
temporary injunction, whichever comes first.”

9.       The
Agreement is in writing, signed by the attorneys for Jensen and for Mr. and
Mrs. Miga, and was filed with the Court on Jan. 27, 2010.  The Injunction
states that “Either Party may seek modification or amendment of this Order at
any time for good cause shown.”

10.     In
March 2010, Miga testified that he had only about $340,000 in collectible
assets left from Jensen’s $23.4 million Payment and had no intention to pay the
Judgment.

11.     In
an informal accounting in June 2003 captioned “Use of Rule 11 Agreement Funds,”
Miga represented to Jensen that he had $9.74 million remaining in “Cash and
securities on hand,” after paying $4.838 million in taxes, paying $1.49 million
in attorney’s fees, spending $2 million cash on a new house, incurring $2.5
million in losses on various investments, repaying a $1.8 million business loan
to a partner to his company Interfax, contributing $220,000 to section 529
educational plans for his sons, contributing $325,000 into an “Irrevocable
Trust” for his sons, and incurring $550,000 in losses on municipal bonds.

12.     In
his deposition in this proceeding in August 2004, Miga discussed the expenditures
listed above in his schedule of the “Use of Rule 11 Agreement Funds,” but
refused to answer any questions about the location of the $9.74 million in
“Cash and securities on hand” on the grounds that those questions invaded his
constitutional right to privacy.  When Jensen moved to compel further
disclosures, Miga also refused, on the same grounds.

13.     In
Miga’s March 2010 deposition, he testified that between March 13 and 19, 2003,
within weeks after the Miga I mandate, he transferred $9.47 million in
cash and securities to “RCR Foundation,” a private “foundation” in Vaduz,
Liechtenstein, under the administration of the Allgemeines Treuunternehmen
(“ATU”) and associated with VP Bank.  Specifically, Miga testified that:

a.       The
assets were located in Liechtenstein.

b.       Miga
had handwritten “RCR Foundation” on the JP Morgan Chase account statement next
to the bank’s reference to the transfers to “VP Bank.”

c.       Miga
funded RCR Foundation to benefit his children after his death, and that he
understood it was akin to an irrevocable trust in the United States.

d.       Miga
had no power to access the assets, to control what VP Bank did with the assets,
or even to see a balance statement on value of the assets held by the Foundation
other than on annual visits by a representative of ATU which ceased after 2008.

e.       Miga
had never received any disbursement of funds from the Foundation.

f.        Because
Miga had no control over the Foundation, he could not repatriate the assets for
payment of the Judgment.

g.       Miga
had no other bank, investment or other accounts outside the United States and
had produced all records relating to such accounts.

14.     After
his March 2010 deposition, Miga produced what purported to be an amendment to
the by-laws of the RCR Foundation, signed by Dr. Guido Meier, and a “Letter of
Wishes” expressing his desire that the assets of the Foundation be distributed
to his two sons at the discretion of the directors after the deaths of Miga and
his wife.

15.     The
deposition of Miga’s personal accountant established that Miga had not reported
or paid taxes on what he claimed to have been a complete and final gift of
almost $10 million to the RCR Foundation, nor had he filed the reports required
for offshore trusts and bank accounts.

16.     After
the March deposition, Miga also produced bank records that showed, among other
things, transfers into his JP Morgan Chase bank account from various overseas
banks, including VP Bank BVI, as well as transfers from an entity identified on
the bank statements as “Bridgeport Group” to meet capital calls from JP Morgan.

17.     A
search of public records in the British Virgin Islands disclosed that the
Bridgeport Group, Inc. had been incorporated by ATU (BVI) Limited, the British
Virgin Islands subsidiary of the Liechtenstein trust company affiliated with VP
Bank, that ATU (BVI) remained the general agent of Bridgeport and that
Bridgeport maintained its office at the same address as ATU [(]BVI). 
Bridgeport Group was incorporated on March 6, 2003, three days after the
Mandate in Miga I.

18.     At
a continuation of his deposition in August 2010, after he produced additional
documents, Miga refused to answer any questions on these subjects on the advice
of his counsel, on the grounds that his answers would tend to incriminate him.

19.     On
the morning of the August deposition, Miga disclosed for the first time the
existence of a former account at First Curacao International Bank and produced
for the first time a statement from that account showing transactions from July
1, 2005 through October 23, 2006.

20.     Miga
testified that the First Curacao account was in his name individually, but that
he used it exclusively to receive payments from customers of his business,
Interfax, who were located in Syria, Iraq, and Iran and therefore were not able
to send money directly into the United States because of restrictions on
currency transfers following the September 11, 2001 attacks.

21.     Miga
testified that although the funds received into the First Curacao account
represented payments due to Interfax, Miga used them for personal purposes. 
Those purposes included making capital contributions for his account and those
of a family trust to Interfax itself.  Miga testified that he also accessed the
funds directly through an ATM card that he could use in the United States.

22.     Miga
testified that he never disclosed the First Curacao account or the income
received into the account to his accountant who prepared his tax returns, or
his Interfax business partner.

23.     Following
the August deposition, Miga represented, through his litigation counsel . . . ,
that he might be willing to sign a letter requesting or instructing VP Bank,
RCR Foundation or ATU to return the assets and all associated proceeds to
enable Miga to pay a part of his debt to Jensen.  However, on November 1, 2010,
Miga’s counsel communicated Miga’s refusal to request repatriation of the
assets on the grounds that it would jeopardize his negotiations with the IRS
for tax amnesty.  Miga refused to consent to allowing the IRS to discuss
resolution of their potentially conflicting . . . claims to the
assets in the Foundation.

24.     On
November 15, 2010, [Miga’s litigation counsel] informed [Jensen’s litigation
counsel] via email that Miga had sent a letter to ATU requesting that RCR
Foundation provide Miga with copies of all documents referring or relating to
the RCR Foundation and/or to the Miga family’s participation therein.  To date,
Miga has represented through [his litigation counsel] that he has received no
responsive documents.

25.     Based
on Miga’s testimony and other representations about RCR Foundation, Jensen
retained counsel in Liechtenstein to obtain an injunction freezing the assets
of the Foundation.  The District Court of the Principality of Liechtenstein granted
an injunction against Miga and the RCR Foundation c/o Allgemeines
Treuuternehmen (General Trust Company) on December 7, 2010.  However, by letter
dated December 14, 2010, Dr. Guido Meier, on behalf of the Foundation Council
for the RCR Foundation, informed the Liechtenstein court that there are not now
nor have there ever been any assets in the RCR Foundation.

26.     On
December 27, 2010, Miga produced a copy of a letter that had been sent by
counsel representing Mr. and Mrs. Miga to the IRS in September in relation to a
request for tax amnesty.  In that letter, the Migas state that:

a.       In
2003 they “transferred approximately $8.5 million in liquid assets and/or
negotiable securities to VP Bank”;

b.       The
assets they transferred came from Jensen’s Payment;

c.       The
“primary account” disclosed “is located at VP Bank, which has headquarters in
Liechtenstein.  The (Migas’) account is located at VP Bank in the British
Virgin Islands (“BVI”), located at 3076 Sir Francis Drake’s Highway, PO Box
3463 Road Town, Tortola, British Virgin Islands”;

d.       “The
Taxpayers’ (Migas’) VP Bank account is held in the name of Bridgeport Group
Inc.”;

e.       William
Green, who is “believed to be a businessman and resident of BVI” is the sole
director and officer of Bridgeport Group;

f.        Bridgeport
Group was formed by RCR Foundation, a foundation established by the Migas and
domiciled in Vaduz, Liechtenstein;

g.       The
Migas estimate their total unreported income stemming from the account(s) to be
between $0 and $100,000 for the years 2003 through 2008; and 

h.       During
2005 and 2006, the Migas []also had an account with First Curacao
International Bank “in order to have a debit card.”

27.     Miga
has not produced any account statements or other documents relating to the
account of Bridgeport Group, Inc. with VP Bank (BVI) or any other foreign bank
other than First Curacao International Bank.

28.     This
Court has authority to enjoin Miga from secreting or further dissipating assets
pursuant to the Turnover Statute, Civil Practice and Remedies Code § 31.002.  In
the Guardianship of De Villarreal, 2009 Tex. App. LEXIS 2249, at *14 [2009
WL 888467, at *4] (Tex. App.—Corpus Christi 2009, pet. [denied]) . . . .

29.     To
obtain injunctive relief in the pre-trial context, the applicant must plead and
prove:  (1) a cause of action against the defendant; (2) a probable right to
the relief sought; and (3) a probable, imminent, and irreparable injury in the
interim.  Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002); Emeritus
Corp. v. Ofczarazak, 198 S.W.3d 222, 226–27 (Tex. App.—San Antonio 2006, no
pet.).  However, “the first two elements that must be established to obtain a
pre-trial temporary injunction are necessarily met when a judgment has been
rendered against a defendant.[”]  Emeritus Corp., 198 S.W.3d at 227.

30.     The
standard for injunctive relief to preserve assets after judgment is different
than the “more general ‘probable, imminent and irreparable injury’ that is
applicable in a variety of pre-trial contexts.”  Emeritus Corp., 198
S.W.3d at 227.  In the post-judgment context, the question is only “whether the
judgment debtor is likely to dissipate or transfer its assets to avoid
satisfaction of the judgment.”  Id.  Evidence of the actual dissipation
or transfer of assets is not necessary to meet this standard.  Id. at
228.

31.     In
this case, the evidence is undisputed that Miga has transferred millions of
dollars of money he received from Jensen to a secret offshore account and taken
extensive actions to prevent its discovery, including falsely marking documents
and deliberately and repeatedly giving false testimony under oath.

32.     The
record therefore establishes that in the absence of injunctive relief, Miga is
likely to dissipate or transfer his assets to avoid satisfaction of the
judgment.

33.     The
record further establishes that Jensen is in imminent and probable danger of
being irreparably harmed if Miga is not enjoined from spending, dissipating,
depleting, secreting, or otherwise moving, transferring, or burdening the
assets that remain available to satisfy the Judgment.  The record establishes
that Jensen is faced with the threat of imminent and irreparable harm in that
any further depletion of Miga’s assets could further reduce Jensen’s recovery,
with Miga claiming to be unable to make up such loss.  Each day of delay
increases the risk of additional irreparable harm to Jensen’s entitlement to
payment of the Judgment.  Temporary relief is accordingly necessary to preserve
the status quo.  If the Court does not issue a temporary restraining order to
preserve the status quo, the Judgment entered by the Court will be rendered
ineffectual in that the Funds will no longer be available, in whole or in part,
for collection.

34.     Jensen
has no adequate remedy at law for the threatened injury, because Miga has
admitted that he no longer retains the full amount of the Judgment even now. 
Any further expenditure, loss, concealment, dissipation, burdening or other
disposition of remaining funds would only further reduce Miga’s capacity to
make restitution and Jensen’s ability to recover what is due to him.  Given the
magnitude of Miga’s obligation, the total losses to Jensen from Miga’s conduct
could easily exceed Miga’s financial worth so as to prevent adequate
compensation to Jensen.

35.     It
clearly appears from these facts that unless Miga is immediately restrained
from spending, dissipating, depleting, secreting, or otherwise moving,
transferring, or burdening, other than in the ordinary course of business
and/or for reasonable and necessary household and living expenses, funds and
assets in the amount of $21,560,150.67, together with pre-judgment interest
thereon in the amount of $1,465,204.21, calculated at the rate of 5.50% simple
interest from December 12, 2003, through March 8, 2005; plus pre-judgment
interest in the amount of $194,927.40 for the dates March 8, 2005 until May 6,
2005, the day preceding the date of judgment, calculated at the rate of
$3,248.79 per day; plus post-judgment interest thereon calculated at the
judgment interest rate of 5.50% compounded annually on the unpaid balance from
May 7, 2005, the date of judgment, until Jensen is paid, representing the
amount of Jensen’s Payment less that amount awarded to Mr. Miga under the
Second Modified Judgment on Remand in Cause No. 048-161505-95, he will commit
the foregoing acts before Jensen has opportunity to collect the Judgment; and
that, if commission of these acts is not restrained immediately, Jensen will
suffer irreparable injury because his ability to recover the Judgment will be compromised.

II. 
Our Jurisdiction

Miga
asks us to treat his original petition for writ of mandamus and his subsequent
brief on appeal and petition for writ of mandamus as one consolidated brief. 
His issues can be divided into two main categories—those complaining that the
trial court had no jurisdiction to enter the postjudgment injunction and those
complaining that even if the trial court had jurisdiction, the trial court
nevertheless abused its discretion by entering the injunction.

As
Miga’s decision to seek both appellate and mandamus relief shows, determining
whether mandamus or appeal is the proper procedural vehicle for his complaints is
tricky.  Caselaw provides that orders under the turnover statute are appealable
because of their mandatory nature,[14] but this injunction is
prohibitory in nature, not mandatory.[15]  Temporary injunctions
are appealable interlocutory orders under section 51.014 of the civil practice
and remedies code,[16] but this injunction,
despite its label, is permanent, not temporary, in character.[17] 
And while permanent injunctions issued with a final judgment are appealable,[18]
an order enforcing a previously signed judgment generally is not a final
judgment or decree and cannot be appealed as such.[19]
 Because we believe that the challenged order is a permanent, prohibitory injunction
designed to enforce the money judgment previously awarded Jensen, we hold that
it is not an appealable order.[20]  We therefore dismiss
Miga’s appeal and address his issues brought via his petition for writ of mandamus
and subsequent brief.

III. 
The Trial Court’s Jurisdiction

Miga
contends that the trial court had no jurisdiction under the turnover statute or
other law to enter the injunction.  But a trial court has the inherent power to
enforce its judgments.[21]  “That power is part of
the court’s jurisdiction, and the court may employ suitable methods to enforce
its jurisdiction.”[22]  “This authority to
enforce is not extinguished by the mere passage of time or the finality of a
judgment.”[23]  The only limitations on
a trial court’s power to enforce its own judgments is that any enforcement
order must be consistent with the original judgment and must not materially
change the judgment.[24]  An order that does
materially change the judgment is void.[25]

The
rules of procedure do not dilute the trial court’s inherent power.  Rule 308 of
the civil rules of procedure provides that a trial court shall cause its
judgments to be executed.[26]  Rule 621 provides that
they shall be enforced by execution or other appropriate process.[27]

The
legislature has also not attempted to reduce the judicial branch’s inherent
power to enforce its own judgments.  Section 31.002(a), the turnover statute, specifically
provides that injunction is a tool for achieving such enforcement:

(a) A judgment
creditor is entitled to aid from a court of appropriate jurisdiction through
injunction or other means in order to reach property to obtain satisfaction
on the judgment if the judgment debtor owns property, including present or
future rights to property, that:

(1) cannot readily be
attached or levied on by ordinary legal process; and

(2) is not exempt
from attachment, execution, or seizure for the satisfaction of liabilities.

(b) The court may:

(1) order the
judgment debtor to turn over nonexempt property that is in the debtor’s
possession or is subject to the debtor’s control, together with all documents
or records related to the property, to a designated sheriff or constable for
execution;

(2) otherwise apply
the property to the satisfaction of the judgment; or

(3) appoint a
receiver with the authority to take possession of the nonexempt property, sell
it, and pay the proceeds to the judgment creditor to the extent required to
satisfy the judgment.

(c) The court may enforce
the order by contempt proceedings or by other appropriate means in the event of
refusal or disobedience.

(d) The judgment
creditor may move for the court’s assistance under this section in the same
proceeding in which the judgment is rendered or in an independent proceeding.

(e) The judgment
creditor is entitled to recover reasonable costs, including attorney’s fees.

(f) A court may not
enter or enforce an order under this section that requires the turnover of the
proceeds of, or the disbursement of, property exempt under any statute,
including Section 42.0021, Property Code. This subsection does not apply to the
enforcement of a child support obligation or a judgment for past due child
support.

. . . .

(h) A court may enter
or enforce an order under this section that requires the turnover of nonexempt
property without identifying in the order the specific property subject to
turnover.[28]

Nowhere
in the language of that statute does the legislature indicate an intent to eradicate
the trial court’s authority to enforce its judgments by restraining behavior
rather than commanding other acts; we therefore reject Miga’s argument that “[t]he
turnover statute does not provide authority for the court to enter a purely
prohibitive injunction against a Defendant to aid the judgment creditor in the
collection of his judgment.”

Miga
also argues that the injunction impermissibly modifies the judgment by granting
Jensen a security interest in all of Miga’s assets, current or future, exempt
or not.  Miga cites with no discussion two El Paso cases for this proposition,[29]
but we can see no correspondence between those cases and this issue, and we
decline to develop Miga’s argument for him.[30]  Further, our review of
the injunction here does not reveal any inconsistency between the judgment and
the injunction, and the injunction does not change the judgment but is merely a
vehicle for its enforcement.

Because
we hold that the trial court had jurisdiction to enter the postjudgment
injunction and that the injunction does not exceed that jurisdiction,  we
overrule all portions of Miga’s issues contending otherwise.  Also, because the
trial court did not rely on the existence of the prior written rule 11
agreement to acquire its jurisdiction to enforce its judgment, we overrule Miga’s
issues concerning that agreement as moot.

IV. 
No Abuse of Discretion by the Trial Court

In
the remaining portions of his issues, Miga contends that the trial court abused
its discretion by issuing the injunction because (A) it is not based on
the evidentiary showing required by the turnover statute, (B) its use of
terms “ordinary,” “reasonable,” and “necessary” makes it impermissibly vague, and
(C) what a judgment debtor does with his property after the judgment is
final and nonappealable “should not . . . be considered conduct
that significantly interferes with the administration of a trial court’s core
functions,” and holding otherwise would “open the flood gates for post-judgment
actions by eager judgment creditors . . . .”

A. 
Evidentiary Showing Under Turnover Statute

Miga
argues that it is impossible for the evidence to make the requisite “showing
that all of this unknown [future acquired] property cannot readily be attached
or levied on by ordinary legal process and/or it is not exempt from attachment,
execution[,] or seizure for the satisfaction of liabilities.”  But that statutory
showing required for a turnover order is not required for a postjudgment
injunction.  As the trial court explained in its findings of fact and
conclusions of law within the injunction, to obtain pretrial injunctive relief,
an “applicant must plead and prove:  (1) a cause of action against the
defendant; (2) a probable right to the relief sought; and (3) a
probable, imminent, and irreparable injury in the interim.”[31] 
But those first two elements are necessarily established when judgment has already
been rendered against a defendant.[32]  The requisites for
obtaining postjudgment injunctive relief to preserve assets are different than
the “more general ‘probable, imminent and irreparable injury’ that is
applicable” pretrial.[33]  To justify a
postjudgment injunction, an applicant must prove only that “the judgment debtor
is likely to dissipate or transfer its assets to avoid satisfaction of the
judgment.”[34]  Evidence of the actual
dissipation or transfer of assets is not necessary to meet this standard.[35] 
“The trial court abuses its discretion in ordering a post-judgment injunction
if the only reasonable decision that could be drawn from the evidence is that
the judgment debtor would not dissipate or transfer its assets.”[36]

The
trial court’s unchallenged findings provide that

·       
Miga
has refused to pay any part of the judgment and has testified that he has no
intention of paying it;

·       
Miga
has testified that he has only about $340,000 left from Jensen’s $23.4 million
payment;

·       
In
an informal accounting in June 2003, Miga represented to Jensen that he had
$9.74 million remaining in “Cash and securities on hand,” after paying $4.838
million in taxes, paying $1.49 million in attorney’s fees, spending $2 million
cash on a new house, incurring $2.5 million in losses on various investments,
repaying a $1.8 million business loan, contributing $220,000 to college funds
for his sons, contributing $325,000 into an “Irrevocable Trust” for his sons,
and incurring $550,000 in losses on municipal bonds;

·       
In
an August 2004 deposition, Miga refused to answer any questions about the
location of the $9.74 million in “Cash and securities on hand”;

·       
In
Miga’s March 2010 deposition, he testified that within weeks after the Miga
I mandate, he transferred $9.47 million in cash and securities to “RCR
Foundation,” a private “foundation” in Liechtenstein.  Miga testified that he
understood that the RCR Foundation was like an irrevocable trust in the United
States; that he had no power to access the assets, to control what the bank did
with the assets, or even to see a financial statement of the assets’ value after
2008; and that he had never received any disbursement of funds from the
Foundation;

·       
Miga
testified that he had no other financial accounts outside the United States and
had produced all records relating to such accounts;

·       
Later,
Miga produced a document purporting to be an amendment to the Foundation’s
bylaws and a letter indicating his desire that the assets be distributed to his
sons after he and his wife died, subject to the discretion of the Foundation
directors;

·       
Miga’s
accountant’s deposition established that Miga had neither reported nor paid
gift taxes on the purported gift of almost $10 million to the Foundation, nor
had he filed required reports for offshore trusts and bank accounts;

·       
After
the March deposition, Miga also produced bank records that showed transfers
into his JP Morgan Chase bank account from various overseas banks, including VP
Bank BVI, as well as transfers from an entity identified on the bank statements
as “Bridgeport Group” to meet capital calls from JP Morgan;

·       
A
public record search revealed that on March 6, 2003, three days after the
mandate in Miga I, the Bridgeport Group was incorporated by a subsidiary
of the Liechtenstein trust company administering the RCR Foundation;

·       
In
the continuation of his deposition in August 2010, Miga refused to answer any
questions on these subjects on the advice of his counsel, on the grounds that
his answers would tend to incriminate him;

·       
In
August 2010, Miga admitted that he had also had an account at First Curacao
International Bank, and he produced a statement from that account showing
transactions from July 1, 2005, through October 23, 2006;

·       
Miga
testified that the account was his individual account but that he used it
exclusively to receive payments from customers of his business who were located
in Syria, Iraq, and Iran and therefore prohibited from sending money directly
into the United States because of restrictions on currency transfers following
the September 11, 2001 attacks;

·       
Miga
admitted that he used funds received into the account for personal purposes and
that he accessed the funds directly in the United States through an ATM card;

·       
Miga
testified that he never told his accountant or business partner about the
account or the income received via the account;

·       
After
the August 2010 deposition, Miga represented through his attorney that he might
be willing to ask or instruct the Liechtenstein bank or trust company to return
the Foundation assets and proceeds so that he could pay part of his debt to
Jensen;

·       
On
November 1, 2010, Miga’s counsel communicated Miga’s refusal to request
repatriation of the assets on the grounds that it would jeopardize his
negotiations with the IRS for tax amnesty.  Miga refused to consent to allowing
the IRS to discuss resolution of Jensen’s and the IRS’s potentially conflicting
claims to the Foundation assets;

·       
On
November 15, 2010, Miga’s lawyer stated that Miga had sent a letter to the
trust company asking that the foundation provide Miga with copies of all
documents referring or relating to the RCR Foundation and/or to the Miga family’s
participation therein.  As of the trial court’s judgment, Miga claimed that he
had received no documents;

·       
On
December 7, 2010, Jensen obtained from a Liechtenstein court an injunction
freezing the assets;

·       
A
week later, Dr. Guido Meier, on behalf of the Foundation Council for the RCR
Foundation, informed the Liechtenstein court in writing that there are not now
nor have there ever been any assets in the RCR Foundation;

·       
On
December 27, 2010, Miga produced a September 2010 letter to the IRS in which he
and his wife stated that in 2003, they transferred about $8.5 million liquid
assets or negotiable securities to the Liechtenstein bank, that the assets came
from Jensen’s payment, that their account is located at the bank’s subsidiary
in the British Virgin Islands, that the account is held in the name of
Bridgeport Group Inc., that Bridgeport Group was formed by RCR Foundation, a
foundation established by the Migas and domiciled in Liechtenstein, that the
Migas estimate their total unreported income stemming from the account(s) to be
between $0 and $100,000 for the years 2003 through 2008, and that the Migas had
the account with First Curacao International Bank “in order to have a debit
card”;

·       
The
evidence is undisputed that Miga has transferred millions of dollars of money
he received from Jensen to a secret offshore account and taken extensive
actions to prevent its discovery, including falsely marking documents and deliberately
and repeatedly giving false testimony under oath.

Accordingly,
we reject Miga’s argument and hold that Jensen has satisfied his evidentiary
burden to obtain the injunction.

B. 
Injunction Is Not Impermissibly Vague

Miga
also argues that the order is impermissibly vague because it uses the terms
“ordinary,” “reasonable,” and “necessary.”  Miga cites no specific authority
for his proposition that these three common terms in legal and legislative
drafting are vague.  Jensen, on the other hand, does cite specific Texas
authority for the proposition that “ordinary course of business” is
sufficiently precise.[37]  Further, as our sister
court in Dallas has pointed out, courts routinely enforce provisions requiring
a party to pay reasonable and necessary expenses.[38] 
We therefore reject Miga’s argument that the injunction is vague and ambiguous
because it uses the terms “ordinary,” “reasonable,” and “necessary.”

C.  Miga’s
Policy Argument

Finally,
Miga argues that what a judgment debtor does with his property after mandate
has issued does not significantly interfere with the administration of a trial
court’s core functions and that upholding an injunction restricting the
expenditures of the debtor until the judgment is paid would encourage hordes of
creditors to seek postjudgment injunctive relief.  Miga ignores the fact that
injunctions are fact-specific and ignores the many unchallenged findings of
fact included in the injunction itself.

Generally,
a permanent injunction “must not grant relief which is not prayed for nor be
more comprehensive or restrictive than justified by the pleadings, the
evidence, and the usages of equity.”[39]  Here, Jensen requested the
relief awarded.  Further, the unchallenged findings of fact show that Miga has consistently
flaunted the trial court’s orders, wasting judicial resources at all levels. 
Finally, the permanent injunction allows Miga to continue to spend money in the
ordinary course of business, for reasonable and necessary household and living
expenses, and for reasonable and necessary attorney’s fees; the injunction is
therefore not overly broad but equitably precise.[40] 
We consequently reject Miga’s remaining argument contending that the trial
court abused its discretion, and we overrule all issues contending that the
trial court abused its discretion by issuing the permanent injunction against
him.

V.  Conclusion

Having
held that this injunction is not appealable, we dismiss Miga’s appeal.  Having
held that the trial court had jurisdiction to issue this permanent injunction
enjoining Miga from spending money except in the ordinary course of business,
for reasonable and necessary household and living expenses, and for reasonable
and necessary attorney’s fees and that the trial court did not abuse its discretion
by issuing the injunction, we deny all mandamus relief.

 

 

LEE
ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED:  March 8, 2012









[1]See Tex. R. App. P. 47.4.





[2]See Miga v. Jensen,
96 S.W.3d 207, 209 (Tex. 2002) (Miga I).





[3]Id. at 210.





[4]Id.





[5]Id.





[6]Id. at 217.





[7]Miga v. Jensen, 299
S.W.3d 98, 101 (Tex. 2009) (Miga II).





[8]Id.





[9]Id.





[10]Miga v. Jensen,
214 S.W.3d 81, 84–85 (Tex. App.—Fort Worth 2006), aff’d, Miga II
at 105.





[11]Miga II at 101,
105.





[12]See Tex. Civ.
Prac. & Rem. Code Ann. § 52.006 (West 2008); Tex. R. App. P. 24.2.





[13]See Tex. Civ.
Prac. & Rem. Code Ann. § 31.002 (West 2008).





[14]Schultz v. Fifth
Judicial Dist. Ct. of Appeals of Dallas, 810 S.W.2d 738, 740 (Tex. 1991), abrogated
on other grounds by In re Sheshtawy, 154 S.W.3d 114, 124–25 (Tex. 2004).





[15]See Lifeguard Benefit
Servs., Inc. v. Direct Med. Network Solutions, Inc., 308 S.W.3d 102,
112 (Tex. App.—Fort Worth 2010, no pet.) (explaining that a prohibitive
injunction forbids conduct but a mandatory injunction requires it).





[16]Tex. Civ. Prac. &
Rem. Code Ann. § 51.014(a)(4) (West 2008).





[17]See Del Valle Indep. Sch.
Dist. v. Lopez, 845 S.W.2d 808, 809 (Tex. 1992); cf. Qwest Commc’ns
Corp. v. AT&T Corp., 24 S.W.3d 334, 335–38 (Tex. 2000) (treating order as
temporary injunction rather than permanent injunction because it restrained
Qwest immediately and while suit was pending).





[18]See, e.g., Operation
Rescue-Nat’l v. Planned Parenthood of Houston and Se. Tex., Inc., 975
S.W.2d 546, 567–70 (Tex. 1998) (affirming judgment and permanent injunction as
modified).





[19]Schultz, 810
S.W.2d at 740.





[20]To foster judicial
economy, we note that should the Supreme Court of Texas ultimately determine
that Miga’s issues are in fact appealable, we would alternatively overrule his
appellate issues for the reasons provided herein and dismiss his petition for
mandamus relief.





[21]Arndt v. Farris,
633 S.W.2d 497, 499 (Tex. 1982); see Tex. Gov’t Code Ann. § 21.001(a)
(West 2004); Tex. R. Civ. P. 308.





[22]Arndt, 633 S.W.2d
at 499.





[23]In re Tarrant Cnty.,
No. 02-05-00274-CV, 2005 WL 3436582, at *4 (Tex. App.—Fort Worth Dec. 12, 2005,
orig. proceeding) (mem. op.) (Livingston, J., dissenting) (citing Tex. R.
Civ. P. 329b; Wall Street Deli, Inc. v. Boston Old Colony Ins. Co., 110
S.W.3d 67, 69 (Tex. App.—Eastland 2003, no pet.); and Reynolds v. Harrison,
635 S.W.2d 845, 846 (Tex. App.—Tyler 1982, writ ref’d n.r.e.)).





[24]Id. at *2, *5
(majority and dissenting ops.); Matz v. Bennion, 961 S.W.2d 445, 452
(Tex. App.—Houston [1st Dist.] 1997, writ denied).





[25]In re Akin Gump
Strauss Hauer & Feld, LLP, 252 S.W.3d 480, 493 n.20 (Tex. App.—Houston
[14th Dist.] 2008, orig. proceeding) (citing Harris Cnty. Appraisal Dist. v.
West, 708 S.W.2d 893, 896–97 (Tex. App.—Houston [14th Dist.] 1986, no writ)
(holding that trial court’s enforcement order was void because it attempted to
materially change the relief awarded in the trial court’s judgment)).





[26]Tex. R. Civ. P. 308.





[27]Tex. R. Civ. P. 621.





[28]Tex. Civ. Prac. &
Rem. Code Ann. § 31.002 (emphasis added).





[29]Moseley v. EMCO Mach.
Works Co., 890 S.W.2d 529, 531 (Tex. App.—El Paso 1994, no writ); Seibert
v. Seibert, 759 S.W.2d 768, 769 (Tex. App.—El Paso 1988, writ denied).





[30]See Tello v. Bank One,
N.A., 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.)
(stating that “we know of no authority obligating us to become advocates for a
particular litigant through performing [his] research and developing [his]
argument for [him]”).





[31]Butnaru, 84 S.W.3d
at 204; Emeritus Corp., 198 S.W.3d at 226–27.





[32]Emeritus Corp.,
198 S.W.3d at 227.





[33]Id.





[34]Id.





[35]Id. at 228.





[36]Id. at 227.





[37]See, e.g., Metra
United Escalante, L.P. v. Lynd Co., 158 S.W.3d 535, 545 (Tex. App.—San
Antonio 2004, no pet.) (citing Helpinstill v. Regions Bank, 33 S.W.3d
401, 405 (Tex. App.—Texarkana 2000, pet. denied)).





[38]Zidell v. Zidell,
No. 05-96-00052-CV, 1997 WL 424429, at *7 & n.13 (Tex. App.—Dallas July 30,
1997, no writ) (not designated for publication) (citing Robbins v. Robbins,
601 S.W.2d 90, 93 (Tex. App.—Houston [1st Dist.] 1980, no writ)).





[39]Holubec v.
Brandenberger, 111 S.W.3d 32, 39 (Tex. 2003) (citing  6 L. Hamilton Lowe, Texas
Practice:  Remedies § 244 at 237 (2d ed. 1973)).





[40]See Villalobos v.
Holguin, 146 Tex. 474, 208 S.W.2d 871, 875 (1948); Brown v. Petrolite
Corp., 965 F.2d 38, 51 (5th Cir. 1992).