In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00197-CV
_____

**ENVIRONMENTAL PROCESSING SYSTEMS, LC,
AND CLARK STEGALL, Appellants**

**V.**

**LARRY P. HORNER, MAX WILLIAMS, JAMES L. PARKS,
LIBERTY DRAW, LTD, U.S. OPERATING, INC., AND
U.S. COMPANIES, INC., Appellees**

**On Appeal from the 75th District Court
Liberty County, Texas
Trial Cause No. CV1206158**

**MEMORANDUM OPINION**

Environmental Processing Systems, LC (EPS) and Clark Stegall, the makers

of a note, seek our review of a judgment holding them jointly liable to the holder of

the note, Larry P. Horner.[1] We affirm.

---

[1] The record reflects that Stegall is the president of EPS, and that he signed
the note individually and as the president of EPS. In their brief, EPS and Stegall state

1

Background

The debt on which Horner based his suit involved a series of previous notes that Stegall and EPS executed in favor of several creditors. Horner acquired the notes of these creditors by assignment, and then, in a separate instrument, he agreed with Stegall and EPS to renew and extend the terms of their notes (the renewal note). Horner's renewal note, which Stegall executed individually and for EPS in 2010, has a stated face value of $3,105,423.[2] Under the terms of the renewal note, the debt that Stegall and EPS owed became due in February 2012.

In May 2012, Horner notified EPS and Stegall that they had defaulted on their obligations under the renewal note. He demanded that they pay the note in full. Four months later, Horner sued EPS and Stegall (the debtors) to collect the principal, interest, and attorneys' fees that he claimed the debtors owed him under the renewal

---

that "Larry Horner is the collection agent on loans extended to EPS by . . . . James L. Parks, Max Williams and his company Liberty Draw, Ltd., as well as U.S. Operating, Inc. (of which Williams is chairman of the board), and U.S. Companies, Inc.[] who were added to this suit by EPS." Larry P. Horner is the only plaintiff named in the plaintiff's original and amended petitions that he filed in his suit, and the note that he foreclosed on defines "Larry Horner or his assigns" as the noteholder. The final judgment identifies Horner as the party who recovered on the note, and the judgment identifies no other parties as creditors based on the sums that are awarded in the final judgment. Consequently, the opinion describes Horner as the holder of the note.

[2] For convenience, the dollar amounts referenced in the opinion have been rounded to the nearest dollar.

note. When the debtors answered, they claimed that Horner, and the noteholders who assigned Horner their notes, had committed usury. The debtors' claims of usury were based principally on two loan transactions that Horner acquired by assignment, the first consisting of a loan from James L. Parks to EPS for $1,000,000, and the second consisting of a loan from U.S. Operating, Inc. to EPS for $500,000. The debtors asserted that these two loan transactions, which Horner held by assignment, violated Chapter 305 of the Texas Finance Code, a provision that penalizes creditors who contract, charge, or receive usurious interest. *See* Tex. Fin. Code Ann. §§ 305.001-.105 (West 2016). After answering Horner's suit, EPS added Parks, Max Williams, Liberty Draw, Ltd., U.S. Operating, and U.S. Companies, Inc. to the suit as third-party defendants. EPS alleged that Horner and all of the creditors that it named as third-party defendants were guilty of usury because they had assigned Horner the notes that were later merged into the renewal note, which Horner then foreclosed by filing suit.

The parties tried the case to the bench in February 2016. At the conclusion of a one-day trial, the trial court awarded Horner $4,526,728 against the debtors, an amount that represents the full amount of the principal and interest due Horner under the terms of his renewal note. The judgment also awarded Horner the right to recover post-judgment interest, attorneys' fees through trial, and provides for his recovery

3

of additional attorneys' fees should the debtors unsuccessfully pursue an appeal. The judgment denied the debtors all relief on their counterclaims and third-party claims.

After the trial, the debtors asked that the trial court file written findings of fact and conclusions of law to support the rulings that are reflected by the trial court's judgment. *See* Tex. R. Civ. P. 296 (Requests for Findings of Fact and Conclusions of Law). After the findings of fact and conclusions of law were filed, the debtors filed a timely joint notice of appeal. On appeal, the debtors argue that the trial court committed error by failing to find that they were charged more than 18% interest on the loans at issue in their suit.[3] The debtors also contend that the evidence admitted in the trial conclusively established that they were charged interest on the loans they claimed were usurious of more than 18% per annum, the rate they argue is the maximum annual rate that applies to their loans.

---

[3] The trial court's written conclusions reflect that it determined that 18% per annum was the interest rate that applied to the debtors' notes. However, Horner argues in his brief that the trial court should have characterized the loan transactions that the debtors challenged as commercial transactions, and as such, he argues the applicable interest rate ceiling that applies to the debt is 28%. *See* Tex. Fin. Code Ann. § 303.009(c) (West 2016) (providing a 28% ceiling for credit extended for a business, commercial, investment, or similar purpose). Because we resolve issues one through three against the debtors, we have determined that it is unnecessary to resolve whether the 18% interest rate ceiling in section 303.009(a) of the Finance Code or the 28% interest rate ceiling in section 303.009(c) of the Finance Code controlled the ceiling for the loans discussed in the debtors' appeal. *Compare* Tex. Fin. Code Ann. § 303.009(a) (West 2016) *with* Tex. Fin. Code Ann. § 303.009(c).

The debtors' claims that the loans extended to them by Horner and others charged interest at a usurious rate revolve almost entirely around the structure of the two loans that Parks and U.S. Operating extended to EPS. Under the terms of those loans, EPS conveyed a total of 24.79[4] units in EPS to Parks and U.S. Operating as partial consideration for the agreements they made with EPS to extend EPS two loans that resulted in EPS receiving loan proceeds of $1,500,000. Both Parks' and U.S. Operating's respective loans indicate that the loans were to bear interest at the rate of 10% per annum. In the trial, the debtors claimed that the value of the units that EPS conveyed to Parks and U.S. Operating, when added to the stated interest that was charged under the terms of the respective loans, resulted in an interest charge for the loans that exceeded the 18% interest rate ceiling described in section 303.009(a) of the Finance Code. *See* Tex. Fin. Code Ann. § 303.009(a) (West 2016).

Based on their claim of usury, the debtors were required to establish how much the units in EPS were worth in February 2001, the month Parks and U.S. Operating received the units of EPS, to establish that Parks and U.S. Operating

---

[4] The loan transactions with Parks and U.S. Operating occurred in February 2001. The written notes and agreements that document the transaction with Parks reflect that he received 16.53 membership units in EPS in partial consideration for agreeing to loan EPS $1,000,000. The documents relevant to the transaction with U.S. Operating indicate that U.S. Operating received 8.26 membership units in EPS in partial consideration for its agreement to loan EPS $500,000.

charged the debtors interest at a rate that exceeded 18%. As previously discussed, the debtors' notes to Parks and U.S. Operating were ultimately assigned to Horner, and the debt represented by these two notes was subsequently merged into a renewal note, which the debtors executed in Horner's favor. The debtors filed counterclaims and third-party claims, asserting that their various creditors, including Horner, Parks, and U.S. Operating, were liable to them for the usury penalties found in the Finance Code. *See* Tex. Fin. Code Ann. § 305.001(a-1) (providing a penalty for usury that occurs in commercial transactions equal to three times the difference between the total interest contracted for or received minus the amount of interest allowed by law).

In the trial, the debtors sought to establish the value of the membership units that EPS transferred to Parks and U.S. Operating based on the loan transaction that occurred in February 2001 through the testimony of EPS's vice president and assistant manager, Diane Harden. Harden did not express an opinion about the fair market value of the shares of EPS in February 2001 or any other date in her testimony. Instead, she gave testimony that concerned several options transactions involving EPS that occurred in 2000. And, Harden also did not address her opinion regarding the fair market value of a unit in EPS in any given month or year.

At trial and on appeal, the debtors argued that Harden's testimony regarding the options transactions conclusively established the value of a unit in EPS during

6

the month of February 2001. Harden's testimony about the options transactions reflects that the transactions creating the options occurred in January and April 2000. In the transactions, EPS granted options to purchase units in EPS to Liberty Draw's general partner, Williams, and to Parks. Liberty Draw's and Parks' options allowed them to purchase a defined number of units in EPS at an exercise price of $44,643. Based on the terms in the options, Parks and Liberty Draw had the right to exercise their options over a ten-year period, which began from the date the respective options were granted.

It was undisputed in the trial that the options were never exercised, and that the exercise price for the options, in part, had been derived in anticipation of the funding of a loan from the U.S. Department of Agriculture. The evidence in the trial showed that the loan was never funded. In her testimony, Harden addressed how Parks, Williams, and EPS reached an agreement regarding the exercise price for their options. Harden explained that the individuals arrived at an exercise price for the options based in part on an appraisal that EPS had on its facilities that it obtained in 1998. She stated that the appraised value was then discounted by a factor of 50%, and then further divided by 112, a number that represented the total number of the membership units in EPS. Harden testified that the formula they used to establish the exercise price for the options was based on input that EPS received from Parks

7

and Williams. Harden explained that EPS expected to use the proceeds of the $500,000 loan that it anticipated getting from the U.S. Department of Agriculture to expand.

In closing argument, the debtors suggested to the trial court that it use the exercise price established in 2000 for the options acquired by Parks and Liberty Draw to calculate the value of the units of EPS that U.S. Operating and Parks acquired in 2001. The trial court rejected the argument, and found in its written findings that Harden's testimony was not based on a fair market value approach to valuing the membership units in EPS. The trial court also found that the debtors failed to prove that they were charged an unlawful interest rate on their loans.

In four appellate issues, the debtors argue (1) the trial court erred by finding that the membership units that EPS conveyed to Parks and U.S. Operating in 2001 were of an uncertain or no value, (2) the evidence admitted during the trial established that the terms of the loans violated Texas usury statutes, (3) the trial court erred by requiring that a market value approach be used to value the units that EPS conveyed to its lenders, and that (4) the trial court erred by relying on the usury savings provisions in EPS's notes in reaching its conclusion that the loans EPS received were not usurious.

## Standard of Review

In this appeal, the record reflects that the trial court filed findings of fact and conclusions of law. *See* Tex. R. Civ. P. 296. In reviewing the trial court's legal conclusions, we apply a de novo standard. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). A conclusion of law may not be challenged on appeal for factual insufficiency, but the reviewing court may review a challenge to a legal conclusion to determine whether the trial court's conclusion was correct. *Id.*

The written findings of fact that a trial court files following a bench trial have the same force and dignity as a jury's verdict. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). Accordingly, challenges that a party raises to the legal and factual sufficiency of the evidence following a bench trial are reviewed on appeal by using the same standards that are applied to the review of legal and factual sufficiency challenges to the verdict of a jury. *Id.*

When conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding, and we indulge every reasonable inference available from the evidence in support of the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We credit evidence that favors the trial court's findings if a reasonable factfinder could have relied on that evidence

to reach its findings, and we disregard evidence that is contrary to the trial court's findings unless a reasonable factfinder could not have disregarded the evidence. *See id.* at 827. Ultimately, we are required to determine whether the evidence admitted in the trial allowed the trial court, acting as a reasonable trier of fact, to make the findings that the appellant has challenged in the appeal. *See id.* Because the trial court is the factfinder in a bench trial, it is the sole judge of the credibility of the witnesses and has the right to weigh the testimony in reaching its verdict. *Id.* at 819.

In reviewing a factual-sufficiency challenge to a finding, we examine the entire record and consider all of the evidence admitted in the trial that is relevant to the challenged finding when evaluating the merits of the challenge. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). After considering all of the evidence, we may set aside the trial court's findings only if the finding that had been challenged is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

In this case, the debtors bore the burden of proof on their affirmative defense of usury. *See* Tex. R. Civ. P. 94*; Apodaca v. Rios*, 163 S.W.3d 297, 305 (Tex. App.— El Paso 2005, no pet.) (usury is an affirmative defense). Therefore, with respect to its claim that the evidence is legally insufficient to support the judgment, the debtors must establish that the evidence they introduced established that the loans in dispute

were usurious as a matter of law. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (explaining that the "matter of law" legal-sufficiency standard applies when adverse finding is one on which the party bore the burden of proof). To prove the loans were usurious, the debtors were required to prove that there was (1) a loan of money, (2) an absolute obligation to repay the principal, and (3) that the creditor exacted a greater compensation than that allowed by law for the use of its money. *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994); *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982). Because the debtors' usury claims revolve almost entirely around the loan transactions that occurred in February 2001, the transactions that involved the transfer of 24.79 units of EPS to Parks and U.S. Operating, the trial court's finding that the debtors failed to establish the value of these units is a controlling finding that is binding on us in the appeal unless our review of the evidence shows that the trial court's finding regarding the failure of the debtors to establish the fair market value of the units in EPS was unreasonable. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

Analysis

The debtors advance two primary arguments in support of their appellate issues. First, they argue the evidence presented in the trial established that the loans Parks and U.S. Operating made to EPS were usurious. Second, they argue that the

11

trial court erred by determining that the lenders did not intend to commit usury and that the lenders' lack of intent shielded them from violating Texas laws that penalize usury. For convenience, we begin with the debtors arguments challenging the trial court's findings that the membership units in EPS "were of uncertain value" in 2001, and that the "value ascribed by [the debtors] to the [units in EPS] was not based on a fair market value approach to valuation."

Our review of the evidence from the trial reflects that the findings the debtors challenge regarding their failure to prove that the loans were usurious was reasonable. The debtors called a single witness in the trial to address the value of a membership unit in EPS.[5] Harden, the witness that the debtors relied on to establish the value of a membership unit in EPS in 2001, never testified about her opinion regarding the fair market value of a unit in EPS in 2001. While Harden testified about how EPS arrived at an exercise price for ten-year options that EPS granted to some of its creditors in 2000, the exercise price for the options is not evidence that was shown in this case to be relevant to the fair market value of a unit of EPS. The exercise price was based on future unrealized expectations, and the evidence shows the expansion anticipated by EPS in 2000 was never realized. The fact that the

---

[5] Horner called Stegall as a witness in proving that the debtors signed the renewal note. When he testified, Stegall was not asked to express an opinion about the fair market value in February 2001 of a membership interest in EPS.

12

options were never exercised is additional evidence that allowed the trial court to infer that the parties holding options in EPS units never considered the options to be worth exercising.

Moreover, there was testimony admitted in the trial that the trial court could reasonably credit in concluding that the exercise price for the options was not evidence relevant to the fair market value of a share in EPS in 2001. Horner, who stated that he holds a license as a certified public accountant, testified during the trial that he is familiar with valuing businesses. Horner explained that, based on his knowledge and experience, the $44,643 valuation that Harden described in her testimony regarding the exercise price for the options did not represent the fair market value of a unit in EPS. No other witnesses testified in the trial about the value of a membership unit in EPS.

At trial, and in their appeal, the debtors argue that the trial court should have found that the units in EPS were valued at $44,643 per unit in February 2001. Ordinarily, absent evidence showing the price that a membership unit in a small closely held company was sold for in the open market, valuing the units of such businesses requires that a calculation be made that is based on evaluating the market value of the business after considering the business's assets minus its liabilities. *See Pabich v. Kellar*, 71 S.W.3d 500, 509 (Tex. App.—Fort Worth 2002, pet. denied).

13

"Book value is entitled to little, if any, weight in determining the value of corporate stock, and many other factors must be taken into consideration." *Bendalin v. Delgado*, 406 S.W.2d 897, 900-901 (Tex. 1966). In this case, no witness testified about the value of the assets that EPS held in February 2001 or the amount of its liabilities at that time. The balance sheets of EPS relevant to the month of February 2001 were not introduced into evidence, so there was nothing in evidence on which the trial court could base a fair market value of a unit in EPS during the month of February 2001. *See generally Miga v. Jensen*, 96 S.W.3d 207, 214 (Tex. 2002) (noting that "contract damages are measured at the time of breach, and not by the bargained-for goods' market gain as of the time of trial"); *Bendalin*, 406 S.W.2d at 900 (evaluating damages based on the value of stock in a closely held corporation by evaluating the proof of the value of the stock at the time of the contingency that gave rise to the claim).

To summarize, our review of the record reflects that the debtors failed to introduce evidence that was relevant to the determination of the fair market value in the units of EPS that Parks and U.S. Operating acquired from EPS in February 2001. The evidence relied on by the debtors was not relevant to proving the fair market value of the units that Parks and U.S. Operating acquired, and the debtors introduced no evidence from which the trial court could have found a fair market value for the

14

units in EPS that Parks and U.S. Operating received in 2001. We conclude that the trial court's findings indicating that the units in EPS were of an uncertain value and its finding indicating that EPS failed to present evidence addressing the fair market value for its units are findings that are supported by the testimony and evidence admitted during the trial. *See City of Keller*, 168 S.W.3d at 820 ("It is the province of the [factfinder] to resolve conflicts in the evidence."). Consequently, the trial court could reasonably conclude based on its findings of fact that the debtors failed to meet their burden of proving that the debtors' creditors extended loans that charged the debtors interest at an unlawful and usurious rate. *See id.* at 819; *Cain*, 709 S.W.2d at 176. Because the evidence supports the trial court's conclusion that the debtors failed to meet their burden of proof on their defense of usury, the trial court's ruling was neither clearly wrong nor unjust. We overrule issues one through three.

Because the debtors failed to meet their burden of proof on the controlling fact issues surrounding their usury claims, we need not address issue four, which argues that the trial court erred by finding that Parks and U.S. Operating did not intend to commit usury. Tex. R. App. P. 47.1 (requiring the opinion of an appellate court to address only those issues that are necessary to the disposition of the appeal). Given

15

our rulings on the issues that are dispositive of the appeal, we affirm the trial court's final judgment.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on July 5, 2017
Opinion Delivered February 15, 2018

Before McKeithen, C.J., Kreger and Horton, JJ.